UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
360 MORTGAGE GROUP, LLC,                                    :
                                    Plaintiff,              :
                                                            :                    19 Civ. 8760 (LGS)
            -against-                                       :
                                                            :                    **OPINION AND ORDER**
FORTRESS INVESTMENT GROUP LLC,                              :
                                    Defendant.              :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

Plaintiff 360 Mortgage Group, LLC brings this action against Defendant Fortress Investment Group LLC alleging tortious interference with an existing contract and prospective business relations, and civil conspiracy to commit tortious interference, following the Government National Mortgage Association's ("GNMA") imposition of sanctions on 360 Mortgage. Defendant moves to dismiss the First Amended Complaint (the "FAC")[1] pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is granted in part and denied in part.

## I. BACKGROUND

The following facts are taken from the FAC and are assumed to be true for purposes of this motion. *See R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2020).

### A. Plaintiff's Involvement in Mortgage Industry

Plaintiff is a privately-owned mortgage bank, founded in 2007, with its principal place of business in Austin, Texas. In October 2011, Plaintiff obtained issuer/servicer status from

---

[1] The motion to dismiss is addressed to the FAC, which because of an administrative error was not filed until after the motion was filed. *See* Dkt. 37, 44, 48.

GNMA, a wholly-owned government association within the Department of Housing and Urban Development ("HUD"), created to facilitate mortgage lending to low-and moderate-income homebuyers. This issuer/servicer status gave Plaintiff the ability to sell mortgage-backed securities ("MBS") backed by GNMA, and to retain the servicing rights.

In late 2012, Plaintiff decided to expand its business model to focus on origination and acquisition of mortgage loans and the associated servicing rights that were eligible for pooling through GNMA and its MBS program (the "MBS Program"). By 2016 and 2017, nearly 90% of Plaintiff's loan acquisitions and securitizations were through the MBS Program. Because of its enrollment in the MBS Program -- and its GNMA issuer/servicer status -- Plaintiff was able to grow as a company and become highly profitable. While comparatively small, Plaintiff received top tier ratings and recognition for its innovation in the mortgage industry. In 2018, Plaintiff was rated by HUD as a "tier one" servicer, the highest category rating available to a HUD approved servicer, and received a 100 out of 100 servicer rating from the Federal National Mortgage Association ("FNMA").

### B.     Monetization Strategy and Defendant's Demands

Defendant is a global investment manager with approximately $42.1 billion of assets, with its principal place of business in New York, New York. In 2018, Plaintiff initiated a monetization strategy to sell a substantial portion of its assets and capitalize on the reputational value the company had accumulated. In two transactions in April and May 2018, Plaintiff sold a majority of its mortgage servicing rights to Defendant, through New Penn Financial, LLC ("New Penn"), a company that Defendant controls and manages. Plaintiff then executed a letter of intent with a third party (the "Doe Corporation") for the sale of Plaintiff's remaining operations, production and technology through the creation of a new entity and a $300 million

recapitalization.  Upon Doe's initial funding of the recapitalization, the members of Plaintiff would own 25% equity in the new entity.  After the parties exchanged drafts of a membership interest purchase agreement in September 2018, and agreed on virtually all of the material terms, a final agreement was to be formally executed in October 2018.

On July 11, 2018, almost two months after closing the first transaction with New Penn, the FAC alleged that Chris Diamond, Defendant's Vice President, called Plaintiff's Chief Operating Officer, stating that Defendant had overpaid for servicing rights and demanding a sum of about $11 million.  Plaintiff refused.  Two days later, on July 13, 2018, Mr. Diamond and Andrew Miller, Defendant's Managing Director/Portfolio Manager, called Plaintiff and again demanded $11 million.  Mr. Miller allegedly threatened to "advise anyone and everyone in the industry" that "[Plaintiff] is not a party that can be trusted," if Plaintiff continued to refuse to pay.  Three days later, on July 16, 2018, Defendant's in-house counsel, Jonathan Grebinar, called Plaintiff's in-house counsel and allegedly stated that, unless Plaintiff paid $11 million, Defendant would "destroy" Plaintiff and interfere with its relationship with GNMA; that Defendant's owners were "billionaires" and not the type of people Plaintiff should "piss off"; that Defendant "intended to put [Plaintiff] out of business" if it did not accede to Defendant's demands; and that Defendant had a close relationship with GNMA and was meeting with GNMA the following morning.

Following this series of conversations, on July 17, 2018, New Penn sent a formal letter from its legal counsel demanding that Plaintiff pay the $11 million or face litigation.  On the same day, Michael Nierenberg, Defendant's Managing Director, sent an email to Plaintiff's President stating that "[Defendant] would do whatever it took to recover the disputed money," that "[Plaintiff] should realize that [Defendant] regularly reviews its counterparties and

3

transactions with the various governing agencies" and that "[i]t is a small world and not honoring your agreements is simply unacceptable." On July 23, 2018, New Penn filed a lawsuit against Plaintiff in New York state court, alleging breach of contract.

### C. GNMA's Sanctions Notice and Aftermath

On October 9, 2018, representatives of GNMA delivered a "Notice of Violation – Immediate Default with Negotiation" (the "Sanctions Notice") to Plaintiff at its Texas offices. The Sanctions Notice, in effect, terminated Plaintiff's contract with GNMA and Plaintiff's issuer/servicer status. Plaintiff told GNMA representatives that there was likely some misunderstanding, in part, because of its near flawless audit record and that its GNMA portfolio was immaterial due to the recent transfer of mortgage servicing rights to New Penn. A GNMA representative allegedly responded that GNMA was "well aware" of the sale and transfer of servicing rights to New Penn; refused to provide substantive explanation for the Sanctions Notice or negotiate with Plaintiff; and indicated that GNMA intended to terminate its contract with Plaintiff.

GNMA's stated reason for terminating Plaintiff's contract and issuer/servicer status was that Plaintiff had three previous notices of violation (the "Violation Notices") -- a 2017 liquidity rounding discrepancy in one account and two more recent allegations related to the pooling and prepayment rates -- all of which Plaintiff disputed in writing and took action to correct. The FAC alleges that the Violation Notices were a pretext resulting from Defendant's pressuring GNMA because Plaintiff had refused to pay the requested $11 million to Defendant. As evidence of this pretext, the FAC identifies Chapter 23, Parts 2 and 3 of the GNMA Mortgage Backed Securities Guide (the "MBS Guide"), which elaborate on the circumstances under which

GNMA is permitted to terminate an issuer's status and interest in mortgages. Part 2 provides, in relevant part, that an "Event of Default" occurs in the event of:

> any other failure of the Issuer to observe or comply with any term or provision of the applicable Guaranty Agreement or this Guide, or any breach of any warranty set forth in the applicable Guaranty Agreement, provided that any failure or breach under this paragraph (11) shall constitute an event of default only if it has not been remedied or corrected within 30 days of notification by [GNMA]. [GNMA] reserves the right in its discretion to declare an immediate default if the Issuer receives three or more notices under this MBS Guide, Ch.23, Part 2, §(A)(11) of failure to comply.

The FAC alleges that GNMA's application of these guidelines to Plaintiff's three prior infractions was unprecedented and unwarranted, and constituted an "extreme deviation" from its practice in similar circumstances. After issuing the Sanctions Notice, GNMA transferred Plaintiff's mortgage servicing portfolio to a different mortgage bank that had never achieved HUD tier one status or a GNMA audit with zero high-risk findings.

Per the Sanctions Notice, Plaintiff was required to notify all material counterparties with whom it did business of its loss of GNMA issuer status. As a result, Plaintiff experienced severe reputational and financial harm. On October 11, 2018, the Doe Corporation terminated its transaction with Plaintiff. FNMA suspended Plaintiff's "seller" approval, thereby prohibiting Plaintiff from selling loans to FNMA. The Federal Home Loan Mortgage Corporation ("Freddie Mac") also stripped Plaintiff of its ability to sell Freddie Mac loans, while allegedly telling Plaintiff that "it had never heard of GNMA taking this kind of action," in light of the minor nature of the Violation Notices. Plaintiff also lost its loan correspondent relationship with Wells Fargo, and business relationships with Planet Home Lending, AmeriHome, Daiwa, Fannie Mae,

5

Customers Bank, Flagstar and the Bank of Oklahoma.  On September 20, 2019, Plaintiff filed this action.[2]

## II.    STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Montero v. City of Yonkers, New York*, 890 F.3d 386, 391 (2d Cir. 2018), but gives "no effect to legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).  To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

## III.    DISCUSSION

As a threshold matter, Defendant argues that, even assuming the truth of the allegations regarding Defendant's improper influence on GNMA, such "petitioning" is protected by the First Amendment under the *Noerr-Pennington* doctrine.  Defendant also seeks dismissal for failure to state a claim.  For the following reasons, Defendant's motion is granted in part and denied in part.

### A.    *Noerr-Pennington* Doctrine

"The *Noerr-Pennington* doctrine . . . [was] developed by the Supreme Court in a series of cases in which it was alleged that defendants' attempts to obtain commercially favorable actions

---

[2] According to Defendant's memorandum in support of its motion, on October 7, 2019, Plaintiff filed for bankruptcy under Chapter 11 of the Bankruptcy Code in the Western District of Texas.

from different branches of government violated the Sherman Act." *Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 100 (2d Cir. 1983); *accord Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 762 (S.D.N.Y. 2020). Where, as here, "a plaintiff claims the defendant tortiously interfered with a [contract] by lobbying a governmental entity, courts applying New York law analyze the First Amendment issue under the *Noerr-Pennington* doctrine." *EDF Renewable Dev., Inc. v. Tritec Real Estate Co., Inc.*, 147 F. Supp. 3d 63, 68 (E.D.N.Y. 2015) (alteration in original) (collecting cases).

The *Noerr-Pennington* doctrine is generally raised as an affirmative defense. *See Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 97 (2d Cir. 2000) (reviewing the district court's decision to grant defendant's motion to dismiss based on defendant's argument its actions were protected by the *Noerr-Pennington* doctrine); *Calabrese v. CSC Holdings, Inc.*, No. 02 Civ. 5171, 2006 WL 544394, at *4 (E.D.N.Y. Mar. 6, 2006) ("[Defendant and its attorneys] raise affirmative defenses based on their constitutional rights to engage in free speech and petition the government and the related *Noerr-Pennington* immunity doctrine."). "An affirmative defense is '[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (alteration in original) (quoting *Black's Law Dictionary* 451 (8th ed. 2004)); *see also Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003).

Dismissal based on an affirmative defense at the complaint stage is warranted only if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis omitted); *accord S.E.C. v. Bronson*, 14 F. Supp.

3d 402, 407 (S.D.N.Y. 2014) ("A court may dismiss a claim on the basis of an affirmative defense raised in the motion to dismiss, only if the facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." (collecting cases)).  Here, Plaintiff's claims are not dismissible under the *Noerr-Pennington* doctrine unless it is apparent from the face of the FAC that this defense necessarily applies -- put another way, Plaintiff has no affirmative obligation to plead facts to show that the *Noerr-Pennington* doctrine does not apply, i.e., that the sham exception applies.  *See Patterson v. Stanley*, No. 16 Civ. 6568, 2019 WL 4934834, at *16 (S.D.N.Y. Oct. 7, 2019) ("Because the application of [a certain section of a federal statute] is an affirmative defense, Plaintiffs have no obligation to plead around it." (citing *BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (summary order))).

Defendant's argument regarding *Noerr-Pennington* immunity is unpersuasive at this stage of the proceedings.  It is not apparent from the face of the FAC that Defendant's attempts to influence GNMA constitute protected petitioning rather than criminal conduct outside the protection of the *Noerr-Pennington* doctrine.  The "corruption" exception to the *Noerr-Pennington* doctrine applies when "a party has stepped beyond the bounds of zealous advocacy and engages in conduct alleged to be criminal, not just deceptive or unethical."  *EDF Renewable*, 147 F. Supp. 3d at 69.  Plaintiff's claims are premised on the allegation that Defendant criminally conspired with GNMA, a wholly-owned government entity, which, at Defendant's

8

direction, damaged Plaintiff by issuing the Sanctions Notice after Plaintiff refused to pay $11 million to Defendant.[3]

### B. Tortious Interference with Contract

The FAC alleges that Defendant tortiously interfered with Plaintiff's contractual relationship with GNMA. Defendant argues that the FAC fails to plead adequately the elements of this claim. Defendant is incorrect.

Under New York law, a claim of tortious interference with contract requires "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019). "Moreover, a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct." *Id.* (internal quotation marks omitted). "Although on a motion to dismiss the allegations in a complaint should be construed liberally, to avoid dismissal of a tortious interference with contract claim a plaintiff must support his claim with more than mere speculation." *Nat'l Air Cargo Grp., Inc. v. Maersk Line Ltd.*, No. 17 Civ. 8659, 2019 WL 4735426, at *7 (S.D.N.Y. Sept. 27, 2019) (applying New York law). Defendant challenges the FAC's pleading of the third and fourth elements and causation.

#### 1. Intentional Procurement of the Third-Party's Breach

With respect to the third element, "[i]t is not enough that a defendant engaged in conduct

---

[3] Both parties address another exception to the *Noerr-Pennington* doctrine, the so-called "sham" exception. These arguments are not addressed here because the allegations in the FAC do not foreclose the applicability of the "corruption" exception, which is sufficient to overcome the *Noerr-Penington* defense at this stage of the proceedings.

9

with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead, a plaintiff must allege facts showing that the defendant's *objective* was to procure such a breach." *Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 445 (S.D.N.Y. 2019) (internal quotation marks omitted) (applying New York law). Plaintiff's claims are premised on the allegation that Defendant intentionally procured GNMA's wrongful termination of its contract with Plaintiff. The FAC alleges that, beginning on July 11, 2018, Defendant's representatives repeatedly called Plaintiff demanding the $11 million; threatened to advise other companies that Plaintiff could not be trusted; threatened to destroy Plaintiff and interfere with its relationship with GNMA; and warned that Defendant was meeting with GNMA, had a good relationship with GNMA and intended to discuss Defendant's disappointment with Plaintiff with GNMA. The FAC also alleges that GNMA issued the Sanctions Notice three months later, and on the same day told Plaintiff it was well aware of the servicing rights sale to Defendant. These allegations plausibly allege that Defendant's objective was to procure GNMA's breach of its contract with Plaintiff. *Cf. Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 319 (S.D.N.Y. 2019) (concluding plaintiff's allegations were inadequate to state intentional procurement of a breach where there was *no allegation* that a third-party's refusal to provide certain electronic data was done at defendant's instruction, that defendant conceived of this plan or even suggested to the third-party to withhold the data (applying New York law)).

Defendant argues that because New Penn initiated suit against Plaintiff to recover money allegedly owed to Defendant and has continued to pursue its claims in state court, it cannot simultaneously follow that Defendant conspired with GNMA to destroy Plaintiff's business, an action that would cause Defendant to lose money. This is, in essence, an "economic interest defense," which applies "where a third party has an 'economic interest' in an entity and

10

interferes with an existing contractual relationship between the plaintiff and that entity." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 283 (2d Cir. 2006) (applying New York law). The defense, which several courts in the Second Circuit have refused to consider at the pleading stage, *see Barnet v. Drawbridge Special Opportunities Fund LP*, No. 14 Civ. 1376, 2014 WL 4393320, at *23 (S.D.N.Y. Sept. 5, 2014) (applying New York law), "only applies when the alleged interfering parties have acted to protect their interest in the breaching party's business . . . [and] not their own." *Horowitz v. Nat'l Gas & Elec., LLC*, No. 17 Civ. 7742, 2018 WL 4572244, at *6 (S.D.N.Y. Sept. 24, 2018) (applying New York law). Here, Defendant has no cognizable legal or financial stake in GNMA and therefore cannot invoke the doctrine.[4] *See White Plains Coat & Apron Co.*, 867 N.E.2d at 283 (clarifying that a defendant may raise the economic interest defense "to protect its own legal or financial stake in the breaching party's business," such as where defendant is a stockholder in the breaching party's business, where there is a parent-subsidiary relationship, where defendant was the breaching party's creditor or where defendant had a managerial contract with the breaching party); *cf. U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 18 Civ. 4044, 2019 WL 4744220, at *9 (S.D.N.Y. Aug. 26, 2019) (concluding that defendant had a sufficient economic interest in the underlying dispute where the complaint and crossclaim alleged that defendant was a noteholder in the breaching party's business (applying New York law)).

---

[4] Defendant argues that it "has every interest to ensure that [GNMA] is appropriately made aware of matters pertaining to entities it regulates." This argument is meritless, as it fails to identify a *direct* financial relationship between Defendant and GNMA sufficiently analogous to the examples identified in *White Plains Coat & Apron Co.*, 867 N.E.2d at 383.

## 2. Actual Breach of the Contract

With respect to the fourth element, "[t]he Second Circuit has adopted a formalistic approach to determining whether a plaintiff has properly alleged breach of a contract in a tortious interference claim." *Taboola, Inc. v. Ezoic Inc.*, No. 17 Civ. 9909, 2020 WL 1900496, at *9 (S.D.N.Y. Apr. 17, 2020) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) (applying New York law)); *accord State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 348 (S.D.N.Y. 2020) (concluding that defendant had plausibly alleged an actual breach, in counterclaims, where defendant alleged that a third-party buyer "agreed to install a plaque providing attribution [of a replica of a statue to defendant]" but did not install it). Regarding the unprecedented nature of GNMA's actions, the FAC alleges that the three previous notices of violation were comparatively insignificant, disputed in writing and that Plaintiff took timely curative action to correct;[5] that, in its twelve-years as a company, Plaintiff received only three notices total and multiple awards for its performance as a mortgage servicer; that GNMA did not immediately declare an Event of Default upon issuance of notice of the third infraction, but rather did so after almost five months; that other participants in the mortgage bank industry receive two to three technical infractions as those in the Violations Notices every month without

---

[5] The FAC alleges that the first notice of violation, in early 2017, involved a rounding error caused by a $101,000 discrepancy in liquidity in one account ($5.070 million versus $5.171 million). After receiving notice of the error, Plaintiff immediately resolved the issue. The FAC alleges that GNMA never replied to the error correction, indicating that the issue was cured and immaterial. The second notice of violation involved GNMA's assertion -- based on the applicable federal code -- that Plaintiff had improperly pooled 47 loans. While Plaintiff disputed the basis for the notice, it took the curative action requested by GNMA. The third notice of violation involved the claim that Plaintiff had a greater loan prepayment speed than that of its peers. Plaintiff objected on the basis that GNMA had benchmarked its prepayment rates against incomparable issuers and portfolios without considering the applicable time period. The FAC alleges that Plaintiff worked with Reuters to provide GNMA with data demonstrating that Plaintiff's prepayment speeds were in line with the rest of the industry average, and that the issue was satisfactorily resolved.

12

having their issuer/servicer status revoked; that, in similar situations, GNMA normally restricts, rather than terminates, issuers, or reduces the dollar amount of MBS which an issuer may issue within GNMA's approval; that, after issuing the Sanctions Notice, GNMA transferred Plaintiff's servicing portfolio to a mortgage bank who had not achieved the same status or ratings within the industry; and that Freddie Mac told Plaintiff that it had never heard of GNMA taking a similar action in light of the circumstances.

Defendant argues -- and Plaintiff does not dispute -- that the MBS Guide[6] technically provides GNMA with the power to declare an immediate Event of Default once it has issued three notices of failure to comply, regardless of whether the violations have been otherwise cured by the time of declaration. As such, Defendant contends that Plaintiff has not adequately alleged an actual breach where the Sanctions Notice was only an exercise of GNMA's contractual discretion. In response, Plaintiff argues that Part 2 of the MBS Guide contains both (1) a "three-strike" rule where three notices of violation constitute an Event of Default *only if* a violation has not been remedied or corrected within thirty days of notification, and (2) in the event that three notices of violations relate to a *substantive* failure to comply with the terms of the MBS Guide, GNMA has the discretion to declare an immediate default, without offering the issuer a chance to remedy or correct. Because, according to Plaintiff, it remedied and/or corrected the Violations Notices when they occurred and GNMA did not declare an Event of Default until almost five months after issuance of the third notice of violation, the Sanctions Notice should not have been issued if the MBS Guide were properly interpreted; similarly, Plaintiff argues that the Violations Notices were not sufficiently substantive in nature to

---

[6] The parties do not dispute that the MBS Guide is incorporated by reference into the contractual agreement between Plaintiff and GNMA.

constitute immediate default.

In addition to offering this plausible reading of the MBS Guide, Plaintiff contends that the contract between the parties must be read with the duty of good faith and fair dealing under New York law, which requires, "when the contract involves the exercise of discretion," that Defendant promises "not to act arbitrarily or irrationally in exercising that discretion." *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017) (applying New York law). In light of the allegations described above regarding the unprecedented nature of the Sanctions Notice, Plaintiff's plausible reading of the MBS Guide and the duty of good faith and fair dealing, Defendant's motion to dismiss the tortious interference with contract claim is denied, as Plaintiff has plausibly alleged an actual breach of the contract between it and GNMA. *Cf. INV Accelerator, LLC v. MX Techs., Inc.*, No. 19 Civ. 2276, 2020 WL 882902, at *5 (S.D.N.Y. Feb. 24, 2020) (finding that counterclaim defendant failed to allege an actual breach of relevant contract, where "[t]here [was] no information as to *how*" the relevant third-party breached the contract (applying New York law)).

### 3. Causation

Defendant separately contends that the FAC does not allege that Defendant was the "but for" cause of Plaintiff's alleged injury because the FAC does not allege any plausible basis to infer that Defendant had the ability to force GNMA to do its bidding. This argument is unpersuasive. The FAC sufficiently alleges that, but for Defendant's influence, the Sanctions Notice would not have been issued, particularly given Plaintiff's success and untarnished record as a mortgage bank for twelve years, its refusal to pay the $11 million, Defendant's alleged threatening statements, the timing and unprecedented nature of the Sanctions Notice in light of the comparatively minor nature of the Violations Notices, the fact the violations were previously

remedied and/or corrected by Plaintiff and the five-month gap between the third violation and the Sanctions Notice. *See Rich*, 939 F.3d at 127 ("[A] plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct." (applying New York law)).

### C. Tortious Interference with Prospective Business Relations

The FAC alleges that Defendant tortiously interfered with Plaintiff's prospective business relations with the Doe Corporation and "one or more third parties." Defendant moves to dismiss this cause of action for failure to state a claim. For the following reasons, Defendant's motion is granted with respect to this claim.

To state a claim for tortious interference with prospective economic advantage under New York law, "the plaintiff must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch*, 449 F.3d at 400; *accord Tera Grp., Inc. v. Citigroup, Inc.*, No. 17 Civ. 4302, 2019 WL 3457242, at *22 (S.D.N.Y. July 30, 2019). "This tort is a difficult one to sustain, with requirements more demanding than those for interference with [the] performance of an existing contract." *Tera Grp., Inc.*, 2019 WL 3457242, at *22 (alteration in original).

The FAC alleges that, as a result of the Sanctions Notice, Plaintiff lost its contract with the Doe Corporation, and other specific business relationships. However, New York law requires that Plaintiff allege that Defendant knew about these relationships and intentionally interfered with them. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 452 N.Y.S.2d 80, 93 (N.Y. App. Div. 1982) ("[E]ven in its most liberal formulation, the relationships [as alleged in a tortious interference with prospective business relations claim] must be specified, as must the

15

defendants' knowledge and the interference."), *aff'd*, 451 N.E.2d 459 (N.Y. 1983). The FAC's allegations regarding Defendant's threats -- about the small size of the mortgage bank industry, that it reviews its counterparties and transactions with various governing agencies and that it would advise other parties that Plaintiff could not be trusted -- do not allege that Defendant knew about, and intentionally interfered with, the prospective business relationships identified by Plaintiff. *See Richardson v. Pratcher*, 48 F. Supp. 3d 651, 673 (S.D.N.Y. 2014) (concluding the same where plaintiff failed to adequately allege that defendants were aware of the existence of a specific business relationship between plaintiff and an investment fund (applying New York law)). Further, the FAC does not contain allegations that Defendant directed any of its conduct toward the prospective third-party business relationships identified by Plaintiff, as is required by New York law. *See Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC*, No. 09 Civ. 2085, 2010 WL 2697137, at *4 (S.D.N.Y. July 6, 2010) ("It is clear . . . that under New York law, in order for a party to make out a claim for tortious interference with prospective economic advantage, the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party."). Accordingly, this claim is dismissed.

   D.  **Civil Conspiracy to Commit Tortious Interference**

  The FAC alleges that Defendant conspired with GNMA, Bright, Kasper and others to commit attempted extortion and tortious interference. Defendant moves to dismiss the civil conspiracy cause of action for failure to state a claim. While New York law does not recognize an independent tort of conspiracy, *see Kirch*, 449 F.3d at 401, it "does allow a claim for civil conspiracy to connect the actions of separate defendants with an otherwise actionable tort." *Marotte v. City of New York*, No. 16 Civ. 8953, 2019 WL 1533304, at *10 (S.D.N.Y. Feb. 7,

2019) (internal quotation marks omitted).  If a plaintiff is able to establish "a separate underlying tort," he must also establish four additional elements: "(1) an agreement between two or more parties [to commit that tort]; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Id.*

While the FAC sufficiently alleges a separate tort -- that Defendant tortiously interfered with the contract between Plaintiff and GNMA -- GNMA cannot be a co-conspirator in that tort because the contract at issue is not with a third party; the contract is with GNMA.  The same is likely true of the other alleged co-conspirators, Bright and Kasper, as they were at all times acting as agents of GNMA.  The FAC also fails to allege facts showing that Bright and Kasper agreed to any wrongful procurement of GNMA's breach of the contract without justification.  The FAC alleges no facts to suggest that they knew or believed that they were acting improperly.  The FAC alleges that at all relevant times, Bright was the acting president of GNMA and Kasper was Executive Vice President of GNMA.  As to Bright, the FAC alleges that in response to Plaintiff's emails to him, GNMA directed Plaintiff to deal with the team on-site at Plaintiff's premises.  As to Kasper, the FAC alleges that he was among GNMA representatives who appeared at Plaintiff's offices and delivered the Notice of Violation; that he stated GNMA's intention to terminate the contract with Plaintiff and seize all data, funds and collateral relating to Plaintiff's GNMA portfolio; that he refused to negotiate with Plaintiff; and that he asserted in substance that Plaintiff had breached its contract with GNMA using language similar to that used by Defendant.  The FAC infers that Defendant communicated with Bright and Kasper about Plaintiff and induced them to take action against Plaintiff.  In short, the FAC does not allege the first element of an agreement -- that they agreed with Defendant wrongfully to induce GNMA's

breach of its contract with Plaintiff.  Consequently, the conspiracy claim is dismissed.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED as to the tortious interference with contract claim and GRANTED as to all other claims.

The Clerk of Court is respectfully directed to close the motion at Docket No. 37.

Dated: September 3, 2020
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

18