UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                           :
360 MORTGAGE GROUP, LLC,            :
                                             :
                       Plaintiff,    :          19 Civ. 8760 (LGS)
                                             :
                  -against-            :         **OPINION AND ORDER**
                                           :
FORTRESS INVESTMENT GROUP LLC,    :
                                             :
                       Defendant.   :
-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

        Plaintiff 360 Mortgage Group, LLC brings this action against Defendant Fortress

Investment Group LLC, alleging tortious interference with Plaintiff's contract with the

Government National Mortgage Association ("GNMA") following GNMA's termination of

Plaintiff's issuer license.  Defendant moves for summary judgment.  For the reasons stated

below, the motion is denied.

## I.       BACKGROUND

        The background facts are drawn from the parties' Rule 56.1 statements and other

submissions on this motion.  The facts are either undisputed or based on evidence in the record

drawing all reasonable inferences in favor of Plaintiff as the non-moving party.  *See Torcivia v.*

*Suffolk Cty.,* 17 F.4th 342, 354 (2d Cir. 2021).

### A.      The Parties

        Plaintiff was a privately-owned mortgage bank, licensed by GNMA in 2011 to service

and originate mortgage loans that would be packaged and sold through GNMA's mortgage-

backed securities ("MBS") programs.  GNMA is a wholly owned government association with

the Department of Housing and Urban Development ("HUD").  In 2011, Plaintiff and GNMA entered into a Guaranty Agreement in which GNMA, in exchange for a fee, agreed to guarantee to the security holders payment of principal and interest on Plaintiff's underlying mortgages in the event that Plaintiff did not ensure such payment.  All issuers participating in any GNMA MBS program must comply with the terms of GNMA's Guaranty Agreements and the GNMA MBS Guide (the "Guide").

Defendant is a New York-based global investment manager with a portfolio of assets in the billions of dollars.  Defendant manages a publicly traded company called New Residential Investment Corp. ("NRZ"), which in 2018 described itself as "a *leading capital provider* to the U.S. mortgage industry."  NRZ, through its division Shellpoint, also has a mortgage servicing business, which in 2018 had over $500 billion in unpaid principal balance of mortgage servicing rights ("MSRs").

B.     Notices of Violation – September to May, 2018

The Guarantee Agreement provides for two types of defaults, an immediate default and a 30-day default.  An immediate default occurs immediately and automatically upon the occurrence of certain specified acts not relevant here.  A 30-day default occurs when an issuer otherwise fails to perform and fails to cure within 30 days of receiving notice from GNMA.  The 30-day default provision states:

> Any failure of the Issuer to observe or comply with any terms or provisions of this Agreement or the Guide, or any breach of any warranty set forth in this Agreement, other than [an immediate event of default] shall constitute an event of default if it has not been remedied or corrected to Ginnie Mae's satisfaction within 30 days of notification by Ginnie Mae to the issuer.

But this provision further states, "Ginnie Mae reserves the right in its discretion to declare

an immediate default if the Issuer receives three or more notices under this subsection (b)."

Accordingly, GNMA issues two types of Notices of Violation ("NOVs")

-- immediate default and 30-day default.

Between September 18, 2017 and May 3, 2018, Plaintiff received three letters entitled

"Notice of Violation – Thirty-Day Default."  The notices respectively charged Plaintiff with

insufficient liquidity, high mortgage pre-payment speeds, and a violation of GNMA's pooling

requirements, i.e. misplacing loans in pools designated as having particular characteristics.  In

each instance, Plaintiff, through counsel, submitted a response that, at least in part, challenged

GNMA's grounds for issuing the NOV.  Each of the NOVs was timely cured to GNMA's

satisfaction within the 30-day cure period.

     C.     <u>Post-Transaction Dispute and Termination of Issuer License</u>

In April and May 2018, New Penn, an affiliate of Defendant, entered into two

transactions with Plaintiff through which Plaintiff sold approximately $5 billion of its GNMA

servicing portfolio to New Penn.

In early July 2018, a disagreement arose between New Penn and Plaintiff regarding an

alleged $11 million overpayment that New Penn had made in connection with the transaction.

Beginning on July 11, 2018, Defendant's representatives began repeatedly calling Plaintiff

demanding that Plaintiff pay the disputed $11 million.  During one of the phone calls, a Fortress

representative warned that "MSRs is a relatively small industry," and threatened, "I would have

to advise anybody who brings up 360 Mortgage and saying that's not someone I would

recommend that you work with."  On July 16, 2018, Defendant's in-house counsel called

Plaintiff's counsel and threatened to put Plaintiff out of business if it did not pay the disputed

amount, and warned that Defendant had a close relationship with GNMA and that it was meeting with GNMA the next day.  On July 17, 2018, Defendant's Managing Executive Director sent an email to Plaintiff's President, stating that "we will do whatever we need to do to recover our money.  You should realize, we are governed by the various agencies and we regularly review our counterparties and transactions with them.  It is a small world and not honoring your agreements is simply unacceptable."  On July 23, 2018, New Penn filed a lawsuit against Plaintiff in New York state court.

During and following the period that Defendant was threatening Plaintiff, Defendant was in contact with GNMA executives about New Penn's dispute with Plaintiff.  On July 23, 2018 -- the same day New Penn filed the lawsuit against Plaintiff -- two of Defendant's employees spoke with GNMA executive Leslie Pordzik on the phone about the contractual dispute between the parties.  Later that day, Defendant's representative sent an email to Pordzik and the director of GNMA's single family program, notifying them of the parties' inability to resolve the dispute and attaching a copy of the lawsuit that had been filed that day.  Notwithstanding the fact that both GNMA witnesses testified that private contractual disputes are outside GNMA's purview, Defendant promised to "keep [GNMA] posted" about the contractual dispute and GNMA's single family program director thanked Defendant for the update.  Between July 16, and July 18, 2018, Defendant's Managing Executive Director exchanged a number of emails with GNMA's senior vice president to schedule a call.

Following the issuance of the third NOV, GNMA conducted a specialized review to determine if what had been Plaintiff's portfolio had any additional pooling violations and in August, found that it did.  The specialized review included loans that had been subject to a previous on-site audit conducted by GNMA, after which GNMA had assured Plaintiff that the

pooling satisfied GNMA requirements.  Plaintiff learned of the investigation and its results for the first time during this litigation.

On October 9, 2018, approximately twenty-five GNMA representatives appeared without warning at Plaintiff's offices in Austin, Texas to hand-deliver a letter to Plaintiff, which stated that it was terminating its issuer license based on the three NOVs, the most recent of which had been issued five months earlier in May 2018.  Although GNMA representatives testified that GNMA ultimately decided to exercise its discretion to terminate the license after discovering the additional violation during the specialized review, the specialized review was not mentioned in the termination letter.  Among those present were GNMA's then Vice President, Chief Operating Officer and HUD special agents.  GNMA's witnesses testified that it was standard practice for GNMA, along with counsel and agents, to hand deliver the default letter to an issuer, but could not recall special agents participating in a "raid" in any other instance since 2014 and stated that it was unusual for "higher up" GNMA executives be in attendance as was the case here.  The letter stated that GNMA was declaring an immediate default pursuant to § 10.01(b) of the Guaranty Agreement based on the NOVs issued to Plaintiff on September 18, 2017, May 2, 2018 and May 3, 2018.  The letter further stated that "Ginnie Mae has authority to negotiate with the issuer to remedy and correct the default," and "[c]onsistent with such authority, Ginnie Mae will forbear from immediately effectuating the Termination and Extinguishment of 360 Mortgage to allow for 360 Mortgage's Secured Party, Texas Capital Bank (TCB), to cure 360 Mortgage's breach as described in the AA."  There apparently was no uncured breach when the letter was delivered.  Plaintiff's executives met with GNMA representatives on-site to explain that there had been a misunderstanding.  In referencing the transfer to New Penn, one GNMA representative stated, "Oh, we're aware."  Following the termination, Plaintiff's representatives

repeatedly reached out to the President and others at GNMA to negotiate, as referenced in the letter, and urge them to reconsider the termination but were unsuccessful.

Following the New York state court's issuance of a temporary restraining order against Plaintiff forbidding Plaintiff to dissipate its assets (i.e., make any payments) in September 2019, Plaintiff filed for bankruptcy on October 7, 2019.

D.      Michael Bright, President of GNMA

Michael Bright was President of GNMA when the decision was made to terminate Plaintiff's license.  He and other GNMA senior executives made the decision to terminate based on the recommendation of lower-level managers, specifically Rene Mondonedo and his staff in the GNMA Monitoring and Asset Management Division.  Shortly after the decision to terminate Plaintiff, Mr. Bright left GNMA to become president and CEO of the Structured Finance Association, to which Defendant is a large contributor.  Mr. Bright was not deposed and there is no admissible evidence about his thought process or the GNMA senior-level decision-making.

E.      HUD's Involvement in Discovery

HUD is a non-party in this action.  After consultation with the U.S. Department of Justice, HUD declined to file any formal statement of interest in this matter.  Given the nature of the allegations, information relating to GNMA's decision making and termination of Plaintff's license is central to the case.  Discovery was extended several times to allow the parties to seek highly relevant information from GNMA.  After several extensions were granted, in October 2020, HUD agreed to produce certain documents and present Mondonedo for deposition.  On November 24, 2020, a discovery conference was held to discuss Plaintiff's anticipated motion to compel against HUD.  Following that conference, HUD was ordered to produce certain documents and the parties were to meet and confer regarding a 30(b)(6) deposition.

On February 11, 2021, this court granted Plaintiff's request to reopen discovery for the limited purpose of allowing an additional HUD witness deposition because the parties were unaware before Mondonedo's deposition that he did not have personal knowledge regarding his superiors' decision to accept his recommendation to terminate Plaintiff's issuer license.  After HUD refused to provide a 30(b)(6) witness from GNMA for live deposition and attempted to instead submit sworn responses to questions, HUD was ordered to produce Pordzik for a 30(b)(6) deposition.  At critical times during the two HUD depositions, counsel for HUD asserted privilege on the ground that GNMA's "internal deliberations" are confidential.  Plaintiff issued subpoenas to depose Bright and the other senior executive who ultimately approved Plaintiff's termination, but HUD was unwilling or unable to produce them and disputed whether Plaintiff had properly made the requests.

## II.    STANDARD

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Johnson v. Jones*, 515 U.S. 304, 314 (1995); *accord Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d Cir. 2021).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk Cty.*, 17 F.4th 342, 354 (2d Cir. 2021).  When the movant

properly supports its motion with evidentiary materials, the opposing party must establish a

genuine issue of fact by citing to particular parts of materials in the record. *See* Fed. R. Civ. P.

56(c)(1)(A). "A party opposing summary judgment normally does not show the existence of a

genuine issue of fact to be tried merely by making assertions that are based on speculation or are

conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

## III.   DISCUSSION

For the reasons discussed below, Defendant's motion for summary judgment is denied.

Under New York law,[1] a claim of tortious interference with contract requires "[1] the existence

of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that

contract, [3] defendant's intentional procurement of the third-party's breach of the contract

without justification, [4] actual breach of the contract, and [5] damages resulting therefrom."

*Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (applying New York law).

"[A] plaintiff must allege that the contract would not have been breached 'but for' the

defendant's conduct." *Id.* (internal quotation marks omitted). Disputes of fact on elements three

and four - - intentional procurement of a breach and actual breach - - preclude summary

judgment. These issues could be overcome if Defendant were to prevail as a matter of law on its

affirmative defense that its conduct is protected by the *Noerr-Pennington* doctrine, but issues of

fact preclude summary judgment on that basis as well.

---

[1] New York law is applied to the tortious interference claim and *Noerr-Pennington* affirmative
defense because Defendant explicitly relies on New York law as the basis for the tortious
interference claim, and Plaintiff does not argue otherwise. *See In re Snyder*, 939 F.3d 92, 100
n.2 (2d Cir. 2019) ("[I]mplied consent is ... sufficient to establish the applicable choice of law[.]"
(quoting *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017)).

A.    <u>Actual Breach of Contract</u>

Questions of fact preclude summary judgment on the fourth element of the tortious

interference claim, actual breach of contract.  Although GNMA "reserve[d] the right, in its

discretion to declare an immediate default if the Issuer receives three or more notices of failure to

comply," the issue is whether GNMA breached its duty of good faith and fair dealing when it

exercised that discretion in this case.  "Every contract imposes upon each party a duty of good

faith and fair dealing in its performance and its enforcement."  Restatement (Second) of

Contracts § 205 (1981).[2]

The parties dispute the standard of proof, whether Plaintiff must prove GNMA's breach

of the covenant of bad faith and fair dealing by clear and convincing evidence or by the usual

preponderance of the evidence.  In either case, the issue is whether GNMA acted arbitrarily or in

bad faith in terminating Plaintiff's issuer license.  This inquiry raises questions of fact regarding

GNMA's intent and motivation.  Construing the evidence in the light most favorable to Plaintiff,

and even applying the more rigorous standard of clear and convincing evidence, a reasonable

jury could find that GNMA's decision to terminate Plaintiff's issuer license was arbitrary or

made in bad faith, specifically that the decision was influenced by Defendant's desire to pressure

or retaliate against Plaintiff in a matter unrelated to GNMA's jurisdiction, that GNMA's decision

was out of the ordinary, disproportionate and draconian as compared with GNMA's usual

---

[2] For purposes of the fourth element of tortious interference with contract – i.e., actual breach of
contract -- federal common law governs the contract between GNMA and Plaintiff.  *See Empire
HealthChoice Assurance, Inc. v. McVeigh ex rel. Est. of McVeigh*, 402 F.3d 107, 109 (2d Cir.
2005) (distinguishing the principle that suits to determine the rights of the United States under its
contracts are governed by federal common law).  In the absence of controlling precedent, courts
often look to the Restatement of Contracts for guidance on the common law of contracts.
*Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*, 239 F. Supp. 3d 710, 734
(S.D.N.Y. 2017) (citing cases).

practices, and that GNMA's President may have received some quid pro quo for his role in the decision.  Based on the evidence that supports these inferences and as detailed above, a reasonable jury could conclude that GNMA's exercise of discretion was arbitrary or in bad faith.

While the issue of breach based on GNMA's alleged violation of the duty of good faith and fair dealing remains for trial, certain other of Plaintiff's arguments are precluded at trial. The operative provision is § 10.01(b) of the Guaranty Agreement.  It states:

> Thirty-day Default.  Any failure of the Issuer to observe or comply with any terms or provisions of this Agreement or the Guide, or any breach of any warranty set forth in this Agreement, other than [an immediate event of default] shall constitute an event of default if it has not been remedied or corrected to Ginnie Mae's satisfaction within 30 days of notification by Ginnie Mae to the issuer. Ginnie Mae reserves the right in its discretion to declare an immediate default if the Issuer receives three or more notices under this subsection (b).

The unambiguous language in the last sentence quoted above permits GNMA to declare an immediate Default if Plaintiff "*receives* three or more notices."  This language is unqualified and does not further require that the three violations remain uncorrected beyond the 30-day cure period.  Consequently, Plaintiff may not argue that GNMA breached Section § 10.01(b).  In addition, § 10.01(b) is unquestionably the relevant provision, since the three NOVs that GNMA issued to Plaintiff were each entitled "Notice of Violation – Thirty-Day Default," and the termination letter from GNMA to Plaintiff specifically references § 10.01(b) and the three NOVs.  Consequently, Plaintiff may not argue a breach of any other provision of Plaintiff's agreement with GNMA.  With the evidence now before the court on summary judgment, this holding supersedes any analysis to the contrary in the prior Opinion and Order on Defendant's motion to dismiss.

B.      Causation

There are material disputes of fact regarding the third element of a tortious interference with contract claim -- Defendant's intentional procurement of GNMA's breach, which requires a showing of "but for" causation. *Rich*, 939 F.3d at 126-27 (applying New York law). "If the breach would have occurred prior to any involvement by the [Defendant] or apart from [its] actions, then of course there would be no but-for causation." *Id.* (internal quotation marks omitted).

Drawing all inferences in favor of Plaintiff as required, the evidence is sufficient for a reasonable jury to find that, but for Defendant's conduct, GNMA would not have terminated Plaintiff's license. First, as part of Defendant's efforts to recoup $11 million of the purchase price from Plaintiff, between July 11 and 18, Defendant made threats to contact GNMA and put Plaintiff out of business. Defendant explicitly threatened that it intended to "put 360 Mortgage out of business" if it did not pay; warned it was a small industry and Defendant would not want to destroy 360 over one deal; referenced Defendant's "good relationship" with GNMA, stated that Defendant was meeting with GNMA to "discuss [its] disappointment with 360" and warned that Defendant regularly reviews its counterparties and transactions with various governing agencies and "not honoring your agreements is simply unacceptable."

Second, during the same period from July 16 to 23, Defendant actually communicated repeatedly with GNMA about the dispute with Plaintiff and sent GNMA a copy of the complaint in a lawsuit Defendant had filed against Plaintiff.

Third, GNMA then terminated Plaintiff's license in circumstances that were out of the ordinary. The termination occurred five months after the third NOV was issued, and only after GNMA learned of the dispute between the parties. GNMA's witnesses raised questions about

11

whether Plaintiff was treated differently from other issuers who received three NOVs and were

not terminated, especially considering that Plaintiff's violations were all cured and not recurring.

GNMA's witnesses also testified that it was standard practice for GNMA, along with counsel

and agents, to hand deliver the default letter to an issuer, but could not recall special agents

participating in a "raid" in any other instance since 2014 and stated that it was unusual for

"higher up" GNMA executives to be in attendance as was the case here. Based on these facts and

the timing of communications between GNMA and Defendant, a reasonable jury could infer that,

but for Defendant's conduct, GNMA would not have terminated Plaintiff's license.

Defendant relies heavily on the fact that both of GNMA's witnesses testified that GNMA

terminated Plaintiff's issuer license due to compliance violations and not as a result of any

influence from Defendant.  Their testimony, which is contrary to Plaintiff's evidence, creates an

issue of fact and warrants denial of summary judgment.  In considering the record on summary

judgment, a court "may not properly grant summary judgment where the issue turns on the

credibility of witnesses."  *Azrielli v. Cohen L. Offs.*, 21 F.3d 512, 517 (2d Cir. 1994); *accord*

*Komondy v. Gioco*, 253 F. Supp. 3d 430, 450 (D. Conn. 2017).  Here, significant gaps in the

record and circumstantial evidence implicate the witnesses' credibility.  *See, e.g.*, *In re Dana*

*Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) ("Circumstantial evidence may permit a factfinder to

infer that a witness had knowledge of a particular fact despite his testimonial denial of

knowledge."); *accord Cox v. Vill. of Pleasantville*, 271 F. Supp. 3d 591, 606 (S.D.N.Y. 2017).

Mondonedo testified that GNMA terminated Plaintiff's license because the special

investigation uncovered a fourth compliance violation and that Defendant did not influence the

termination decision.  But drawing inferences in Plaintiff's favor, a reasonable jury could

conclude that the special investigation was suspect.  The specialized review did not uncover the

additional violation until August 2018, after the dispute had arisen between the parties.  The

specialized review was directed at "just the things bought from 360," according to Mondonedo.

The investigation resulted in an NOV issued to New Penn and was not offered as a reason for

Plaintiff's termination.  A reasonable jury could infer that GNMA was looking for additional

evidence to justify both the termination and the five-month delay between the third NOV to

Plaintiff and the termination.  However, GNMA in the end did not rely on the investigation in

Plaintiff's termination letter, perhaps because the fourth NOV was not issued to Plaintiff and the

text of the Guaranty Agreement permitted immediate termination after three NOVs in any event.

As for GNMA's second witness, Pordzik, although she repeatedly denied that Defendant

had any involvement in GNMA's termination decision, she did not make the initial

recommendation or ultimate decision to terminate.  Mondonedo made the recommendation to

her, which then went to the Chief Risk Officer, and then on to the Chief Operating Officer and

the then-President, Mr. Bright.  None of these three most senior decision-makers was deposed or

offered evidence.  In preparing for her 30(b)(6) deposition, Pordzik spoke with senior GNMA

executives, but their statements to her are inadmissible hearsay.  A party "cannot rely on

inadmissible hearsay in opposing a motion for summary judgment, absent a showing that

admissible evidence will be available at trial."  *Davis v. City of N.Y.*, No. 13 Civ. 6260, 2021 WL

3492307, at *11 (E.D.N.Y. Aug. 9, 2021) (quoting *Burlington Coat Factory Warehouse Corp. v.

Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).  Admissible evidence may be introduced

through affidavits or declarations that are "made on personal knowledge, set out facts that would

be admissible in evidence, and show that the affiant or declarant is competent to testify on the

matters stated."  Fed. R. Civ. P. 56(c)(4).  Since the ultimate GNMA decision-makers were never

deposed and no affidavits were submitted from them, their statements are not in the record.

13

Although Plaintiff ultimately has the burden of proof at trial to prove all of the elements of tortious interference, Plaintiff may rely on circumstantial evidence and, at summary judgment, all inferences must be drawn in Plaintiff's favor.

Defendant's reliance on *Conte v. Emmons*, 895 F.3d 168 (2d Cir. 2018) is misplaced. In *Conte*, the Second Circuit overturned a jury verdict finding tortious interference with contract by two prosecutors and an investigator in their office. The claim arose out of their investigation, which did not lead to charges, but allegedly led to the demise of Plaintiff's company and in turn its breach of contract with distributors, printers and advertisers. The court found no evidence of intent because there was no evidence that the prosecutors had any personal interest or "ulterior purpose outside of . . . law enforcement goals" in procuring the breach. *Id.* at 173. The court also found the evidence insufficient where the effect of the investigation on the plaintiff's contracts "was simply incidental to [the prosecutors] intent" to investigate thoroughly allegations of fraud. *Id.* The court found that it would be a "detriment [to] law enforcement" to accept the jury's finding on a "bare record" and would "invite suits against prosecutors" whenever the subject of an investigation lost business following a somewhat overzealous investigation. *Id.* Unlike in *Conte*, the Defendant here was a corporation not engaged in any law enforcement goal, with an expressly stated personal interest of influencing GNMA to terminate Plaintiff's contract because Plaintiff refused to pay Defendant the demanded $11 million. On the issue of causation, the circumstantial evidence recounted above is sufficient for a reasonable jury to find that, but for Defendant's communications with GNMA about Plaintiff, GNMA would not have conducted the special investigation, and would not have belatedly terminated Plaintiff after three timely-cured NOVs.

C.      *Noerr-Pennington* Doctrine

Unresolved questions of fact and law preclude summary judgment under the *Noerr-Pennington* doctrine.  "The Noerr-Pennington doctrine . . . [was] developed by the Supreme Court in a series of cases in which it was alleged that defendants' attempts to obtain commercially favorable actions from different branches of government violated the Sherman Act."  *Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 100 (2d Cir. 1983); *accord Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 762 (S.D.N.Y. 2020).  Under the doctrine, "attempts to influence legislative, executive, administration or judicial action are immune from liability by virtue of the First Amendment right to petition the government for a redress of grievances."  *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 335 (S.D.N.Y. 2019); *see also Singh v. NYCTL 2009-A Trust*, 683 F. App'x 76, 77 (2d Cir. 2017) (summary order) ("[T]he *Noerr-Pennington* doctrine encompasses all petitioning activity . . .").

The parties' briefing leaves questions unresolved regarding Defendant's potential immunity under the *Noerr-Pennington* doctrine, including the extent to which the doctrine should apply in these circumstances, and the existence, scope and applicability of the doctrine's exceptions.  *Compare, e.g., Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 898-99 (10th Cir. 2011) (rejecting bribery exception to the *Noerr-Pennington* doctrine); *and Armstrong Surgical Ctr., Inc. v. Armstrong City Mem'l Hosp.*, 185 F.3d 154, 161-62 (3d Cir. 1999) (rejecting corruption exception to *Noerr-Pennington* doctrine), *with Fed. Prescription Serv., Inc., v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981) ("Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and

15

activities of this sort have been held beyond the protection of Noerr."); *and Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) (recognizing corruption exception to *Noerr-Pennington* doctrine).  On these issues, the parties cite no decision that would control in applying New York law[3] -- e.g., from either the New York Court of Appeals or the Second Circuit construing New York law.  *See 10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 221 (2d Cir. 2021) ("In construing New York law, we are bound . . . by the law of New York as interpreted by the New York Court of Appeals . . . ." (internal quotation marks omitted)).  To the extent there are no such binding decisions, the parties also do not present any authority or analysis that persuades the Court of one outcome over another.

Assuming for purposes of this motion that either the sham exception or so-called corruption exception applies, Plaintiff raises factual questions regarding Defendant's conduct that would not be protected activity under First Amendment principles and the *Noerr-Pennington* doctrine.  *See Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498 (1949) (holding that the First Amendment does not protect "speech or writing used as an integral part of conduct in violation of a valid criminal statute."); *accord United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1581 n.6 (2020).  These factual questions preclude summary judgment for Defendant based on the *Noerr-Pennington* doctrine.

For example, GNMA's President, Michael Bright, who was involved in the termination decision, left GNMA shortly after the termination and became CEO of the Structured Finance Association, a lobbying group for structured finance companies, of which Defendant is a large contributor.  Construing the evidence in the light most favorable to Plaintiff, based on the timing

---

[3] It is assumed that New York law applies in construing an affirmative defense to a New York common law cause of action, although First Amendment principles may also apply.

of Defendant's alleged threats, Bright's apparent role in the termination decision, the extraordinary nature of GNMA's actions under the circumstances, and Bright's departure from GNMA to the CEO position in an organization in which Defendant had clout, a reasonable jury could infer an improper quid pro quo between Defendant and Bright in connection with Defendant's "lobbying" activity.

Inasmuch as the legal questions concerning the applicability and scope of the *Noerr-Pennington* doctrine in this case must be resolved before trial, a separate order will issue scheduling supplemental briefing.

## IV.    CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is denied.  The Clerk of Court is respectfully directed to close the motion at Docket No. 166.  A trial scheduling order will follow.

Dated:  March 30, 2022
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE