**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **360 MORTGAGE GROUP, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | **Case No.: 1:19-cv-8760** |
| | § | |
| **v.** | § | |
| | § | |
| **FORTRESS INVESTMENT GROUP LLC,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | **JURY TRIAL DEMANDED** |

<u>**PLAINTIFF'S SECOND AMENDED COMPLAINT**</u>

360 Mortgage Group, LLC ("**Plaintiff**" or "**360 Mortgage**" or "**360**") files this First

Amended Complaint against Fortress Investment Group LLC ("**Defendant**" or "**Fortress**"), and

respectfully states:

<u>**Introduction**</u>

1.      Fortress is a global investment manager with approximately $42.1 billion of assets

under management, and a powerful and influential force in the financial and mortgage industries.

360 Mortgage is a small, privately-owned mortgage bank based in Austin, Texas that employed

approximately one-hundred and fifty people when these events occurred. 360 Mortgage

encountered both the ire and the influence of Fortress when it sold a substantial portion of its assets

to New Penn Financial, LLC ("New Penn")[1], a company Fortress controls and manages.[2] After the

sale to New Penn was complete and the initial portions of the purchase price were paid, Fortress,

---

[1] At the time of the sale, the transaction was between 360 Mortgage and New Penn.  In or about July 2018, having become a wholly-owned subsidiary of New Residential Investment Corporation ("NRIC"), New Penn changed its name and began to operate as NewRez, LLC. For the sake of clarity and consistency, this company shall be referred to herein as "New Penn."

[2] Fortress exercises complete control over NRIC. Fortress's managers, officers, and directors are also managers, officers, and directors for NRIC. Fortress's in-house counsel even serves as in-house counsel for NRIC.

acting out of its interest in New Penn, demanded that 360 Mortgage agree to accept an $11 million reduction to the contractually agreed-upon price. In making such demand, Fortress expressly threatened to destroy 360 Mortgage's business and industry reputation by using its influence with GNMA if it did not agree to pay to New Penn that $11 million amount.

2.      360 Mortgage rightfully rejected Fortress's demand because it contradicted the express terms of the New Penn contract. Fortress then made good on its threat to contact and influence GNMA.[3]   Soon after, under the influence and at the behest of Fortress, GNMA inexplicably issued "death-penalty" sanctions against 360 Mortgage and terminated its GNMA contract.  GNMA based its action on a strained interpretation and unprecedented application of its guidelines, as it had never before imposed "death-penalty" sanctions except in cases involving issuer insolvency or fraud.  Further, in imposing its most severe remedy on 360 Mortgage, GMNA relied on a recharacterization of a mere three infractions that occurred over a span of more than two years and had long since been cured by 360 Mortgage to GNMA's satisfaction. The three infractions were immaterial and posed no possible harm to GNMA, to its investors, or to borrowers. However, the result of GNMA's unprecedented action was devastating to 360 Mortgage, destroying the company in a matter of days. The unprecedented, strained, and disproportionate action by GNMA has but one explanation: It was an arbitrary, capricious abuse of its discretion contrived at the behest of Fortress to destroy 360 Mortgage—exactly as Fortress had threatened to do.

3.      This case seeks to hold Fortress accountable for its flagrant abuse of power and corrupt influence on GNMA.

---

[3] Fortress did so even though New Penn had already determined that the appropriate means for resolving the dispute was to bring litigation against 360 Mortgage under the contract, which New Penn actually filed on or about July 23, 2019.

## Parties

4.      Plaintiff 360 Mortgage Group, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 11305 Four Points Drive, Austin, Texas. Founded in 2007, 360 Mortgage is a privately-owned mortgage bank. It actively participated in the wholesale, correspondent, and retail sectors of the mortgage industry. 360 Mortgage is owned by BJCH, Ltd., JAGG I FLP, and Mushue Ventures, LP. All are Texas citizens.

5.      Defendant Fortress Investment Group LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business located at 1345 Avenue of the Americas, 46th Floor, New York, New York 10105. Fortress is a highly diversified global alternative investment manager, which externally manages and advises countless affiliates, companies, and entities. Its members are citizens of New York and Delaware. Fortress may be served with process pursuant to Federal Rule of Civil Procedure 4 by mailing a copy of this Complaint and the summons by first class mail postage prepaid to 28 Liberty St., New York, New York 10105; Attention: CT Corporation System.  Fortress is owned by SoftBank Group Corp., a corporation organized and existing under the laws of Japan, with its principal place of business in Tokyo, Japan; and by Wesley Edens, who on information and belief is an individual and citizen of the State of New York; and by Randal Nardone, who on information and belief is an individual and citizen of the State of New York; and by Peter Briger, who on information and belief is an individual and citizen of the State of California.  None of Defendant Fortress's owners are citizens of the State of Texas.

## Non-Party Co-Conspirators

6.      Non-Party   Co-Conspirator   Government   National   Mortgage   Association ("GNMA") is a self-financing, wholly owned U.S. Government corporation within the Department

of Housing and Urban Development that is the primary financing mechanism for all government-insured or government-guaranteed mortgage loans.

7.      Non-Party Co-Conspirator Michael Bright ("Bright") was, at all relevant times, the acting president of GNMA, and is now the Chief Executive Officer of the Structured Finance Association ("SFA"), a lobbying group for structured finance companies of which Fortress is a prominent donor and active participant.  Bright resigned from GNMA to assume the role of CEO of the SFA shortly after the events described herein.

8.      Non-Party Co-Conspirator Maren Kasper ("Kasper") was, at all relevant times, Executive Vice President of GNMA and, after the resignation of Bright, assumed the role of acting president of GNMA.

9.      Non-Party Co-Conspirator Leslie Meaux (Meaux) was, at all relevant times, Executive Vice President of GNMA and the head of servicing for GNMA.

10.     Non-Party Co-Conspirator Paul St. Laurent (St. Laurent) was, at all relevant times, Senior Mortgage Banker for GNMA.

## Jurisdiction and Venue

11.     The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00. Plaintiff and Defendant are citizens of different states. Accordingly, subject-matter jurisdiction is properly predicated upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a).

12.     This Court has personal jurisdiction over Fortress because it is headquartered in New York and because Plaintiff's causes of action arise out of and relate to conduct and activities of Defendant in New York. The exercise of such jurisdiction is consistent with due process under the United States Constitution.

13.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of New York and because Defendant resides in the Southern District of New York. 28 U.S.C. § 1391(b)(1)-(2).

### Factual Background

**A.  360 Mortgage: An Innovator is Created.**

14.     The founders of 360 Mortgage created their small yet unique mortgage company in 2007, with the intent to innovate the industry with technology and special mortgage offerings while taking advantage of the exodus of mortgage banks during the financial crisis. At that time, for example, the industry still used facsimile transmission as a primary method of communication and confirmation of mortgage-related tasks. 360 Mortgage's unique focus on technological improvement, its ability to "go-green" with state-of-the-art paperless technology from origination through securitization, and its ability to write its own code to create an exclusive technology platform, allowed it to outperform many competitors in efficiency, productivity, and customer service. Overall, 360's model was to create value to its customers by providing service and products to the underserved.

15.     By way of background, in the mortgage industry, when a mortgage note is created, it actually contains two separate assets. First, the ***note*** itself is an asset. For example, a common mortgage note might be a loan for $200,000, at 4% for 30 years. The second asset is the right and obligation ***to service*** the mortgage note. The "servicer" of a mortgage loan is the entity that handles the day-to-day tasks for managing the loan, including collecting payments from borrowers and remitting payments to investors.

16.     Early on, 360 Mortgage focused on third-party origination. *Wholesale third-party origination* is a process in which a loan originator, unaffiliated with the lender (i.e., 360 Mortgage), identifies and takes the application of a prospective borrower and then submits that loan

application to the lender who then underwrites, closes, and packages the mortgages to either sell to an investor or securitize itself. *Correspondent third-party origination* is a process in which a lender, known as an investor or aggregator (*i.e.*, 360 Mortgage), acquires the closed mortgage loan and servicing rights from another lender. Both *wholesale* and *correspondent* lenders are commonly referred to within the industry as third-party originators ("TPOs"). 360 Mortgage also participated in the *retail origination* sector of the mortgage industry. *Retail* is similar to the wholesale third-party process except the loan originator is an exclusive W2 employee of the lender (i.e. 360 Mortgage). In all three origination channels (*wholesale, correspondent and retail)*, the closed mortgages are then delivered to the secondary mortgage market.

17.    In late 2011 and early 2012, changes were made to the Home Affordable Refinance Program ("**HARP**"), which is a program that assists underwater homeowners to refinance their mortgages. 360 Mortgage identified these changes as an opportunity to amass a sufficient quantity of mortgage servicing rights in order to add mortgage servicing as a business channel. Through 360 Mortgage's essential relationship with the Federal National Mortgage Association ("**Fannie Mae**" or "FNMA"), the company positioned itself to accept HARP loans through its TPO relationships. Critically, these HARP loans could only be sold to FNMA. As such, due to its relationship with FNMA and its unique understanding of the HARP program, 360 Mortgage became one of a small group of lenders offering the product nationwide.

18.    In late 2012, 360 Mortgage decided to expand its business model to focus on origination and acquisition of mortgage loans and the associated servicing rights that were eligible for pooling through the Government National Mortgage Association ("**GNMA**" or "**Ginnie Mae**") and its mortgage-backed securities ("**MBS**") program. By 2013, over half of 360 Mortgage's loan acquisitions had shifted to GNMA MBS eligible loans. For 2016 and 2017, nearly 90% of 360

Mortgage's loan acquisitions and securitizations were through GNMA's MBS. Because of its enrollment within GNMA's MBS program, 360 was able to grow and thrive and become highly profitable.

19.     GNMA is a wholly-owned government association within the Department of Housing and Urban Development ("**HUD**"), created to facilitate mortgage lending to low-income and moderate-income homebuyers. Under the MBS program, once 360 Mortgage obtained issuer status with GNMA, 360 Mortgage could package certain federally-insured or guaranteed mortgages into groups or "pools" that back securities which are then sold to both public and private investors. GNMA guarantees that the investors will receive timely payment of principle and interest on those securities. As a result, GNMA's guarantee is critical to the value of the securities.

20.     360 Mortgage obtained GNMA issuer/servicer status through a valid contract with GNMA in October 2011. Once it became a GNMA issuer, 360 Mortgage had the ability to pledge government-guaranteed mortgage notes to GNMA guaranteed MBS.  It could then sell those MBS, which had the full faith and credit of the US Government, and retain the servicing rights.

21.     The GNMA issuer/servicer approval is difficult to obtain and, once received, is recognized throughout the mortgage industry as a symbol of the strength and capabilities of a mortgage company. Furthermore, the GNMA approval and the associated ability to issue MBS provides a company like 360 Mortgage with access to all federally-guaranteed mortgage programs such as FHA, VA, and USDA, without the restrictions and complexities traditionally associated with selling loans to private investors.  The GNMA MBS program provides near limitless liquidity to a company such as 360 Mortgage.

22.     Though relatively small, 360 Mortgage became recognized for its innovation in the mortgage space, and constantly maintained numerous top tier ratings and scores. **In 2018,**

**360 Mortgage was rated by HUD as a Tier One Servicer, the highest category rating available to a HUD approved servicer**. In addition, **360 Mortgage had achieved the highest servicer rating given by FNMA**, a perfect score of 100 out of 100. 360 Mortgage had the highest ratings achievable within the industry.

### B. The Planned Monetization Events.

23.     In 2018, after approximately 10 years of profoundly hard work and extraordinary innovation, the members of 360 Mortgage initiated a series of transactions to sell a substantial portion of 360 Mortgage's assets and subsequently capitalize on the reputational value the company had accumulated. Indeed, 360 Mortgage was an attractive acquisition target due to its GNMA issuer status and extraordinary ratings in the industry. This monetization strategy was to be executed in three parts.

24.     The first part of 360 Mortgage's monetization strategy was to sell the majority of its servicing rights to a third party. Through a process of blind bids, Fortress, through New Penn, was successful in securing the right to buy the servicing rights by offering the highest and winning bid for the portfolio of loans offered by 360 Mortgage. New Penn ultimately contracted with 360 Mortgage to buy the servicing rights, and did in fact buy and pay the initial portion for the 360 Mortgage servicing rights through a series of two back-to-back substantively identical transactions closed in April and May 2018.

25.     As discussed, Fortress manages NRIC, which wholly owns New Penn. NRIC executives are also executives at Fortress. Executives at Fortress are also executives at NRIC. The e-mail address for many of the NRIC executives is "@fortress.com." In addition, the in-house legal counsel for Fortress, NRIC, and New Penn is the same person. Fortress, assisted by New Penn's legal counsel, drafted the contract (including its pricing provisions) for New Penn's purchase of the 360 Mortgage servicing rights.

26.     The second part of the monetization strategy developed by 360 Mortgage's founders was to sell 360 Mortgage's remaining operation, production, and technology, while retaining a far more valuable ownership interest in a newly formed entity. A third party (hereinafter "**Doe Corporation**")[4] desired to purchase 360 Mortgage through a newly-created entity and open a new market by (1) building on 360's proprietary technology, operations and management team, and (2) investing $300 million of capital into the 360 model and employees.

27.     The Doe Corporation and 360 Mortgage executed a letter of intent on July 30, 2018 ("**Doe LOI**") for the Doe Corporation to purchase 360 Mortgage's operations through a $300 million recapitalization of the company. A Membership Interest Purchase Agreement was submitted to 360 Mortgage on August 22, 2018, to which 360 Mortgage responded with revisions on September 11, 2018. The Doe Corporation sent a revised draft on September 27, 2018, in which 360 Mortgage and the Doe Corporation agreed upon virtually all of the material terms of the agreement. The formal execution of a final agreement was to occur in October, 2018. Upon Doe Corporation's initial funding of its recapitalization commitment, the members of 360 Mortgage would collectively own a 25% equity position in the newly-created entity. This equity position, along with Doe Corporation's fulfillment of its recapitalization commitment, represented a massive multiple to 360 Mortgage and the most lucrative part of the scheduled liquidity events.

28.     The third and final part of 360 Mortgage's intended monetization strategy was to license 360's IP software and talented pool of employees, which 360 had trained from the ground up. 360 engaged several interested companies in various stages of negotiations in 2018 and was

---

[4] Due to a non-disclosure agreement between 360 Mortgage and the third-party, Plaintiff is unable to reveal the name of this third-party entity.

actively working to complete the final stage of its monetization strategy at the time GNMA terminated 360 Mortgage's issuer status.

**C. Fortress's Attempted Extortion and Scheme to Ruin 360 Mortgage**

29.    On July 11, 2018, almost two months after closing the first transaction with New Penn, and only a week after control of the servicing rights for both transactions had irrevocably transferred from 360 Mortgage to New Penn, Chris Diamond, the Vice President of Fortress, called the Chief Operating Officer of 360. Mr. Diamond demanded that 360 Mortgage **pay New Penn 20% of the purchase price**, a sum of about $11 million. Mr. Diamond stated that they had "overpaid." That position, however, contradicted the express terms of the contract that **New Penn (Fortress) had itself drafted**. Now Fortress apparently sought to re-write the contract, one that was heavily negotiated by sophisticated parties (including New Penn's legal counsel). As a result, 360 Mortgage rightfully refused to pay the extortion money.

30.    Two days later, on July 13, 2018, Fortress called again. Specifically, Andrew Miller, Fortress's Managing Director/Portfolio Manager, and Chris Diamond spoke with 360 Mortgage's Chief Operating Officer. Through Miller and Diamond, Fortress again demanded that 360 Mortgage pay 20% (approximately $11 million) of the purchase price even though Fortress knew that New Penn was not entitled to this money pursuant to the terms of the contract, stating specifically on multiple occasions that they had "made a mistake" that was "in favor" of 360 in negotiating the MSR sales contracts. This time, however, Miller also threatened that he would "advise anyone and everyone in the industry" that "360 Mortgage is not a party that can be trusted" if 360 Mortgage refused to pay.

31.    Three days later, on July 16, 2018, Fortress again attempted to coerce 360 Mortgage when Fortress's in-house counsel, Jonathan Grebinar, called 360 Mortgage's in-house counsel. Intending to instill fear in 360, Grebinar escalated Fortress's previous threat, this time promising

"to destroy" 360 Mortgage and interfere with 360's relationship with GNMA if 360 did not immediately pay New Penn/Fortress approximately $11 million dollars. Grebinar also assured 360 Mortgage's in-house counsel that Fortress had the capacity to carry out its threat because the owners of Fortress were "billionaires" that were not typically the type of people companies want to "piss off." Grebinar also stated that "Fortress intended to put 360 Mortgage out of business" if it did not accede to Fortress's demands. Grebinar warned that Fortress had a close relationship with GNMA and stated that the Fortress team was meeting with representatives of GNMA for breakfast the following morning, indicating that he would use the opportunity to make good on Fortress's threats. None of this would happen, of course, if 360 paid the $11 million.

32.    It was at this time that Fortress began to implement two courses of action to pressure 360 Mortgage into accepting its baseless demand for an $11 million payment. First, on July 17, 2018, Fortress had New Penn send a formal demand letter from its legal counsel demanding that 360 Mortgage pay the money or face litigation. However, on the same day, Michael Nierenberg, a Managing Director at Fortress, sent a threatening email to 360 Mortgage's President stating that "Fortress would do whatever it took to recover the disputed money." Nierenberg went on to ominously warn that "360 Mortgage should realize that Fortress regularly reviews its counterparties and transactions with the various governing agencies," then adding, "It is a small world and not honoring your agreements is simply unacceptable." The only conclusion that can be drawn from these threats is that Fortress arrogantly views itself as the lone arbiter of such contract disputes and the sole authority for their enforcement, presumably due to its considerable influence and connections with government authorities like GNMA.

33.    Despite its fear that Fortress would carry through with its threats, 360 Mortgage held firm. New Penn filed a lawsuit against 360 the next week (July 23, 2018). Despite New Penn

having this legitimate avenue to pursue its (albeit baseless) claim, Fortress nonetheless barged ahead with its threats to destroy 360 Mortgage.

**D.  Fortress Conspires with GNMA.**

34.    On the morning of Tuesday, October 9, 2018, representatives of GNMA appeared without warning at 360 Mortgage's offices in Austin, Texas. Among the GNMA representatives was Kasper, St. Laurent, and a GNMA lawyer, Ayasha Ainashbekova. Incredibly, and as further evidence of the bizarre, unprecedented, and overtly harassing and intimidating purpose of the raid, GNMA brought along with them Special Agent Andrew Lee and Special Agent Walter Zapata of HUD's Office of the Inspector General.  From the manner in which GNMA conducted the raid and the disproportionate nature of the "investigation" compared to the alleged "violations" that prompted it, it is clear that GNMA's purpose was not to perform an above-board financial audit, but rather to raid, hassle, and intimidate 360 Mortgage at the direction of Fortress.

35.    The GNMA representatives delivered a letter to 360 Mortgage entitled "**Notice of Violation – Immediate Default with Negotiation**." The notice indicated that, pursuant to GNMA's authority to negotiate with the issuer (360 Mortgage) to remedy and correct "the default," GNMA would forebear from immediately effectuating the Termination and Extinguishment of 360 Mortgage. Although the notice directed 360 Mortgage to address any questions to Rene Mondonedo, GNMA's Director of Monitoring and Asset Managing Division, Mondonedo refused to speak with 360 Mortgage or its counsel, instead directing 360 to discuss any issues with the GNMA individuals on site. At that point, it became clear that GNMA wished to deliver a message outside of written correspondence, so 360 Mortgage's executives met with the GNMA representatives on site.

36.    Initially, 360 Mortgage explained to the GNMA representatives that there was likely some misunderstanding because (1) 360 Mortgage had a near flawless audit and review

history and (2) 360's remaining GNMA portfolio was immaterial due to the recent transaction with New Penn, under which 360 had transferred the vast majority of its GNMA portfolio to New Penn over the summer. GNMA's representative, St. Laurent, responded emphatically that GNMA was "**well aware**" of the sale and transfer of the servicing rights to New Penn, indicating that Fortress had already expressed to GNMA its complaint and disapproval of 360 Mortgage's response to Fortress's extortive threats regarding the New Penn deal.

37.    GNMA refused to provide any substantive explanation whatsoever as to why it was making such an unprecedented raid and taking such extreme action on 360 Mortgage. Instead, contrary to the content of the October 9 Notice of Violation, Kasper made it clear that GNMA was on site to terminate its contract with 360 Mortgage, extinguish 360's interest in its GNMA portfolio, and seize all data, funds, and collateral relating to 360 Mortgage's GNMA portfolio. Kasper, St. Laurent, and GNMA refused to negotiate or even discuss any of the purported issues with 360, despite the official GNMA notice suggesting that 360 Mortgage would be permitted to remedy the matter. GNMA's on-site representatives even refused to speak with 360 Mortgage's outside counsel, insisting instead on speaking directly with 360 Mortgage executives alone in 360 Mortgage's conference room.

38.    A number of these in-person meetings occurred during GNMA's raid of 360 Mortgage on October 9, 2018. During one of them, when 360 Mortgage's executives pleaded for the rationale behind GNMA's "death-penalty" sanctions, Kasper expressly stated that "360 Mortgage was bound by its contract with GNMA, which 360 Mortgage should not have signed if they did not wish to follow its terms." Kasper's words were suspiciously similar to a statement that an officer of 360 Mortgage had earlier made to Fortress when Fortress demanded a re-write of the New Penn contract and payment of $11 million. Specifically, in a July 13, 2018 phone call

between Fortress's Andrew Miller and Christopher Diamond, and 360 Mortgage's Chief Operating

Officer, 360 Mortgage had responded to Fortress's demands for payment of $11 million with a

statement that the words in the New Penn contract have to mean something, and if New Penn did

not want to follow those words it should not have signed the agreement. Kasper's precise

knowledge and regurgitation of the Chief Operating Officer's earlier words during the October 9th

raid were clearly intended to deliver Fortress's message, providing vivid proof that Fortress had

used its power and influence with Bright, Kasper, and GNMA to carry out its threat to destroy 360

Mortgage.

**E. GNMA's Pretext for "Death-Penalty" Sanctions is Evidenced by its Unwarranted and Extreme Deviation From its Usual Course of Action**

39.     Of course, GNMA knew it could not *lawfully* declare 360 Mortgage in default and

terminate and extinguish 360 Mortgage's issuer status just to settle a score for Fortress. Instead,

GNMA had to come up with a pretext for imposing the "death penalty" sanctions on 360 Mortgage

as a means of carrying out Fortress' mandate that it destroy 360 Mortgage.

**a. GNMA's Pretext for Terminating and Extinguishing 360 Mortgage**

40.     GNMA's stated reason for its termination of 360 Mortgage was that 360 Mortgage

had three previous notices of violation. Specifically, GNMA relied on a single ministerial

infraction from nearly two years earlier,[5] and two more recent immaterial alleged violations[6]—all

---

[5] In early 2017, a rounding error caused a $101,000 discrepancy in liquidity in one account ($5.070 million versus $5.171 million). Upon its receipt of notice from GNMA, the issue was immediately resolved by 360 Mortgage. Notably, GNMA never replied to 360 Mortgage's correction of the error, indicating that the issue was cured and immaterial to GNMA.

[6] The second alleged "violation" involved GNMA's assertion that 360 Mortgage had improperly pooled 47 loans based on GNMA's misinterpretation of the applicable federal code. GNMA requested that 360 Mortgage re-purchase the 47 loans and gave approval to re-pool those 47 loans in a different manner. Although 360 Mortgage disputed the basis for the notice, it took the exact curative action requested by GNMA. The third purported "violation" involved the prepayment of loans. GNMA notified 360 Mortgage that it believed 360's servicing portfolio had a greater prepayment speed than that of its peers. 360 Mortgage objected to this notice because GNMA had inappropriately benchmarked 360 Mortgage's prepayment rates against incomparable issuers and portfolios without considering the applicable time period. GNMA was essentially comparing apples to oranges. 360 Mortgage worked with Reuters to

of which 360 Mortgage disputed in writing and took timely curative action to correct. Notably, GNMA did not attempt to declare an Event of Default immediately upon the issuance of its third notice of an infraction committed by 360 Mortgage. Instead, GNMA declared the default almost five months after issuing the third notice of infraction, and only after Fortress intervened to incite GNMA against 360 Mortgage. After 360 Mortgage refused Fortress's extortive demands for an $11 million reduction in the New Penn contract price, GNMA went back in time and re-characterized these immaterial and long-resolved "violations" as a pretext for imposing "death-penalty" sanctions against 360 Mortgage.

> **b. GNMA was forced to rely on an historically unprecedented and unwarranted interpretation and application of its own guidelines in imposing the termination and extinguishment remedies against 360 Mortgage.**

41.      The pretextual nature of GNMA's stated reason for terminating and extinguishing 360 Mortgage is clearly evidenced by its historically unprecedented interpretation and unwarranted application of its own guidelines, as well as its extended five-month delay in exercising the extraordinary act of declaring in hindsight an immediate Event of Default based upon three minor infractions that had long since been cured. Specifically, Chapter 23 Parts 2 and 3 of the GNMA Mortgage Backed Securities Guide (the "Guide")[7] dictate the circumstances under which GNMA is permitted to terminate an issuer's status as an approved GNMA issuer and extinguish an issuer's interest in mortgages. Importantly, both termination of issuer status and extinguishment of an interest in mortgages (both of which GNMA imposed on 360 Mortgage as a result of Fortress's improper influence) are remedies available to GNMA that are strictly reserved for situations in which there is an "Event of Default" as set forth in Chapter 23 Part 2.

---

provide GNMA with data demonstrating that when compared to its actual peer group, 360 Mortgage's prepayment speeds were in line with the rest of the industry average. This issue was also satisfactorily resolved with GNMA

[7] The Guide is incorporated by reference into the contract that existed between GNMA and 360 Mortgage at the time of the events relevant to this Complaint.

42.    Part 2 provides, in relevant part, that an event of default occurs in the event of:

> "any other failure of the Issuer to observe or comply with any term or provision of the applicable Guaranty Agreement or this Guide, or any breach of any warranty set forth in the applicable Guaranty Agreement, provided that any failure or breach under this paragraph (11) shall constitute an event of default only if it has not been remedied or corrected within 30 days of notification by Ginnie Mae. ***Ginnie Mae reserves the right in its discretion to declare an immediate default if the Issuer receives three or more notices under this MBS Guide, Ch.23, Part 2, §(A)(11) of failure to comply.***"[8] (emphasis added)

43.    To declare an Event of Default under the general rule set forth in the first sentence of this provision (quoted above), GNMA would have to allow the issuer a period of 30 days in which to cure or remedy any failure to comply or observe before imposing its own remedy against such issuer (including termination and extinguishment). Under the second sentence of such provision, however, GNMA reserves the power to declare an *immediate* Event of Default once it has issued three notices of failure to comply (regardless of whether any one or all of such violations have been otherwise cured or remedied at the time of such declaration). As a policy matter, this latter reservation of power is strictly to allow GNMA a means of protecting itself, its investors or its borrowers from either (1) an issuer that habitually fails to comply with the requisite guidelines and thereby poses a substantial threat of harm through these repetitive failures (even if cured)[9] or (2) a violation so egregious that it poses the threat of imminent harm such that, in GNMA's discretion, GNMA cannot afford to wait 30 days for the violation to be cured.

---

[8] https://www.ginniemae.gov/issuers/program_guidelines/MBSGuideLib/Chapter_23.pdf (available on GNMA's website at : https://www.ginniemae.gov/issuers/program_guidelines/Pages/mbsguidelib.aspx)

[9] Though this 3-strike rule does not expressly require a compressed time frame in which three violations must occur, the rule is plainly intended to address repetitive violations that were of a very serious nature and occurred in a very compressed timeframe. As will be discussed, 360 Mortgage has been informed by multiple industry participants that they themselves have received, and understand that other mortgage companies have received, GNMA notices of violations relating to as many as two or three technical infractions of the same sort as committed by 360 Mortgage as often as monthly for several consecutive months without GNMA exercising this 3-strike rule. As noted, 360 Mortgage received only three notices of violations over its entire 12-year existence, with the first such notice preceding the other two notices by almost two years.

44.     360 Mortgage's three prior infractions do not fit either of these circumstances, nor do they come close to posing such a severe threat of harm that an *immediate* declaration of an Event of Default was warranted. It is clear that GNMA could not justify, based on even a hindsight recharacterization of the three aged infractions, declaring an Event of Default under the first sentence of the general rule set out in the Guide, since 360 Mortgage had already timely cured each of these three infractions.[10] Thus, GNMA had to invoke the extraordinary 3-strike remedy provided in the second sentence.  But prior to Fortress's weaponization of its influence with GNMA against 360 Mortgage, GNMA had exclusively applied that exceptional remedy to cases involving issuer insolvency or fraud.

45.     Because there was no legitimate justification or basis for GNMA's declaration of an *immediate* "Event of Default" against 360 Mortgage, GNMA's action can only be explained as resulting from Fortress using its influence to compel GNMA to apply its guidelines in an unprecedented manner to destroy 360 Mortgage.[11]

---

[10] Under this general rule of Chapter 23, Part 2, §(A)(11) of the Guide, once a failure to comply is cured, such failure no longer constitutes an "event of default" that is actionable as a basis for GNMA seeking a remedy under such general rule.

[11] Importantly, GNMA could not have used as a predicate for its declaration of an Event of Default Fortress' allegation of 360 Mortgage breaching its contract with New Penn. The mere allegation of a breach of a third-party contract to which GNMA was not a party would surely not have constituted an event of default under any of the other provisions in §(A)(1)-(10) of Chapter 23, Part 2 and could have only constituted *a failure to comply or a breach of warranty* under §(A)(11), if at all, if and when such allegation were proven in Fortress' litigation against 360 Mortgage. Fortress was simply not willing to wait for the court to fairly determine if 360 Mortgage had actually breached its contract before proceeding with its plan to use GNMA to target and destroy 360 Mortgage's business. Relying on GNMA's unprecedented and unwarranted declaration of an Event of Default under the 3-strike rule was the only immediate way to fulfill its threats against 360, not to mention it being the only way to "box" 360 Mortgage into a position where it had little, if any, right to appeal or otherwise assert any rights of due process against any action taken by GNMA.

**c. GNMA's termination and extinguishment of 360 Mortgage constitutes an extreme deviation from its usual course of action, and thus a deprivation of due process and equal protection which Fortress conspired with GNMA to bring about.**

46.    As further evidence of the pretextual nature of GNMA's actions against 360 Mortgage, GNMA's termination and extinguishment of 360 Mortgage is grossly disproportionate to its normal practice with respect to issuers who have been found guilty of even the most serious violations (which 360 Mortgage's alleged violations were not).

47.    GNMA normally **restricts**, rather than terminates, issuers—even when the issuer in question is accused of **fraud (of which 360 Mortgage has never been accused)**. For example, as recently as January 31, 2019, GNMA restricted, but did not terminate, the status of an issuer (loanDepot) that was accused of fraud. On this same date, GNMA removed previous restrictions on another issuer (Freedom Mortgage) that it had not terminated. Freedom Mortgage had also been accused of fraud. In fact, two days prior to GNMA lifting the restrictions on Freedom Mortgage, the Department of Justice ("**DOJ**") filed civil fraud complaints against Freedom Mortgage. GNMA utilizes the "death-penalty" sanction of termination and extinguishment extremely rarely and only in the most egregious circumstances.[12]

48.    A less draconian yet still extremely rare course of action for GNMA to take in a non-fraud related default is to reduce an issuer's commitment authority (that is, the dollar amount of MBS which an issuer may issue within GNMA's approval). According to an April 2019 report of the Government Accountability Office's analysis of GNMA's operations, any issuer on GNMA's "Watch List" (a list created in 2008 as a formal compilation of issuers warranting more

---

[12] *See* https://www.gao.gov/assets/700/698185.pdf (showing on page thirty-six that only one to three issuers were terminated each year between 2011 and 2017).

intensive monitoring due to credit or operational risk) will have its access to commitment authority analyzed and limited, requiring additional reviews and approvals.[13]

49.    And yet, GNMA did not merely restrict 360 Mortgage. Nor did GNMA merely reduce or eliminate 360 Mortgage's commitment authority to prevent 360 Mortgage from issuing any new securities, as it would have done if 360 had been on its "Watch List". GNMA did not merely suspend 360 Mortgage for a fixed time frame as GNMA ordinarily and publicly performs discipline. Rather, **GNMA wholly and definitively terminated and extinguished 360,** in an unprecedented action that clearly indicated GNMA had succumbed to the unlawful and malicious influence of Fortress.

50. In sum, all three of the purported "violations" cited by GNMA were erroneous, immaterial, and presented no damage or risk (financially, reputationally, or otherwise) to GNMA, the security holders, or borrowers. All were timely responded to and resolved by 360 Mortgage without further comment by GNMA. Between May 2018 (the date of the third alleged "violation") and October 9, 2018, when GNMA appeared on site to raid 360's offices, GNMA made no effort to terminate, restrict, or even suspend 360 Mortgage's issuer status. It did not issue a letter, nor make any reduction to 360's commitment authority. GNMA issued no reprimand. In fact, GNMA has *never* terminated an issuer such as 360 Mortgage for such hyper-technical infractions.  Such a draconian termination and extinguishment has never happened before and would not have happened in this case in the ordinary course of business, absent the ire, influence, and interference of Fortress.

51.    To be clear, there was no legitimate basis for GNMA to terminate 360 Mortgage's contract or issuer status. It was only after 360 Mortgage refused to capitulate to Fortress's

---

[13] *See* https://www.gao.gov/assets/700/698185.pdf, at p. 30, p.35, n.62 and n.72.

extortionate demands, despite its overt threats that it would destroy 360 Mortgage and interfere with its relationship with GNMA, that GNMA wrongfully terminated 360 Mortgage's issuer status. The ugly reality is that GNMA destroyed 360 Mortgage at Fortress's insistence. Fortress achieved its retribution against 360 Mortgage by lying to GNMA and maliciously using its power, influence, and connections to conspire with and wrongfully induce GNMA to destroy 360 Mortgage—exactly as Fortress's representatives had threatened to do.

52.    The evidence that GNMA was acting under the direct and corrupt influence of Fortress to destroy 360 Mortgage is not limited to Fortress's overt threats or the disproportionate and unprecedented extent of the sanctions GNMA imposed. The behavior and words of GNMA and HUD representatives further establish that all the regulatory personnel involved were well aware something untoward was going on.

53.    While GNMA's October 9, 2018 raid was in progress, 360 Mortgage's counsel made a call to a representative of HUD's Office of the Inspector General in Washington, D.C. to obtain more information about the reasons for the immediate declaration of an Event of Default, the termination of 360's issuer status, and the seizure of its remaining servicing portfolio. Astonishingly, the OIG representative responded, "We don't have any idea why this is happening. Do you?"

54.    After stripping 360 Mortgage of its servicing portfolio, GNMA transferred that portfolio to Carrington Mortgage to assume responsibility for the servicing of those mortgages.  A few months later, a former 360 Mortgage manager spoke to a high-ranking employee of Carrington Mortgage to ask whether Carrington Mortgage had ever achieved HUD Tier-1 Status or had a GNMA audit with *zero* high-risk findings, both of which 360 Mortgage had achieved. The Carrington Mortgage employee confirmed that Carrington Mortgage had *never* achieved either—

raising the obvious question of how GNMA could be acting to protect investors and borrowers by transferring the servicing book of a Tier 1 servicer (360 Mortgage) to a lower-tier servicer (Carrington Mortgage). The answer, of course, is that GNMA was not acting out of its role to protect investors and borrowers, but rather at the direction of Fortress to destroy 360 Mortgage.

55. When told that GNMA acted against 360 Mortgage ostensibly due to three notices of violations, one of which erroneously asserted unusually high prepayment rates, the same Carrington Mortgage employee responded that (1) "Nobody can control prepayment rates," and (2) that Carrington Mortgage routinely received "three or four notices of violation *per month*." Again, GNMA's actions had nothing to do with 360 Mortgage's performance as an issuer and servicer, but resulted only from Fortress's corrupt manipulation of its relationship with and influence over GNMA.

56. In the immediate wake of GNMA's punitive and draconian raid on 360 Mortgage and imposition of "death-penalty" sanctions, the head of 360 Mortgage's servicing business repeatedly called and emailed Bright, as well as Leslie Meaux, the Executive Vice President and Head of Servicing for GNMA, to implore them to assist 360 Mortgage in resolving what appeared, at the time, to be at best an overreaction by GNMA to some very bad information about 360 Mortgage. Specifically, 360 Mortgage's manager called and emailed Bright on October 10, 2018; called and emailed Ms. Meaux on October 10, 2018; emailed Bright, copying Ms. Meaux, on October 12, 2018; and emailed Ms. Meaux, copying Bright, on October 12, 2018 and October 17, 2018. Each of those calls and emails indicated why GNMA's actions were unwarranted and inconsistent with GNMA's own guidelines and precedent, and requested responses. However, the *only* response 360 Mortgage received to these repeated efforts to work with GNMA was that all questions should be directed to the GNMA and HUD on-site team conducting the raid at 360 Mortgage's offices,

but that those personnel were not authorized to negotiate or discuss any matters other than the logistics of transferring 360 Mortgage's servicing portfolio.  360 Mortgage, of course, had no option but to cooperate with the GNMA and HUD personnel on-site, as it faced very stiff fines and penalties had it refused to do so.

57.  Further evidence that GNMA was acting outside its normal guidelines, rules, and procedures (at least as those have always been applied in other instances) came months later, in April 2019, at a Five-Star Institute governmental forum in Washington, D.C.  One of the keynote speakers at that forum was none other than Ms. Meaux.  Ms. Meaux's remarks repeatedly emphasized to the audience of mortgage servicing industry members how "open" GNMA was to "working with" mortgage servicers, whom she referred to as GNMA's "partners."  Ms. Meaux claimed GNMA is "open and receptive" to the concerns of issuers and servicers, and if they ever had "any issues," they must feel free to call her directly, and that she and GNMA maintain an "open door" and "always welcome" opportunities to meet with servicers and issuers.

58.  Unbeknownst to Ms. Meaux, the by-then former head of 360 Mortgage's servicing operation was sitting in the audience listening to her remarks. After she finished speaking, he politely approached her and introduced himself.  Not surprisingly, Ms. Meaux's face turned ashen as she realized who had just approached her.  When the former 360 Mortgage manger asked her to explain why, in light of her remarks at the forum, she never returned his calls or responded to his emails to her, Ms. Meaux had no response and simply turned and walked away. "Open and receptive"?  Perhaps to the billionaires at Fortress, but not to small players like 360 Mortgage. Even GNMA's own description of its approach to conflict resolution with servicers and issuers condemns how it treated 360 Mortgage and evidences that other factors were at work—namely, the powerful "Fortress factor" that drove GNMA to run 360 Mortgage out of the industry.

**F. No Nexus Existed Between Any Purported Claim to the Disputed Money and Fortress's Threatened Action.**

59.    Fortress was not acting in furtherance of its own economic interests given that New Penn had already commenced legitimate efforts to recover the disputed money. In fact, any purported claim to the money had no nexus to Fortress's threatened action: the destruction of 360 Mortgage's business. Not only would the destruction of 360 Mortgage do nothing to facilitate payment of the disputed money, but it would likely impede any payment due to the resultant financial devastation 360 suffered.

60.    Moreover, neither Fortress or New Penn, to the extent Fortress was acting in a representative capacity on New Penn's behalf, would materially benefit from the destruction of 360 Mortgage. One of the reasons New Penn purchased servicing rights from 360 Mortgage was because 360 Mortgage was a top-tier servicer with an impeccable record, and Fortress is in the business of aggregating servicing rights. In other words, New Penn purchased from 360 because of the value created by doing business with a top-rated servicer and GNMA issuer. By destroying 360's contractual relationship with GNMA (and therefore its ability to service and generate new GNMA loans and issue new GNMA securities), New Penn (and Fortress) could no longer acquire servicing rights from 360 Mortgage in the future. In addition, New Penn had purchased over 5 billion dollars' worth of loans from 360 Mortgage that 360 could have provided streamlined assistance with in the future through access to GinnieNet, GNMA's online portal for issuers. However, once 360 was terminated and extinguished by GNMA and its business destroyed, it lost access to the issuer portal and all of the information associated with the loans forming the basis of the transaction. As a result, 360 has to rely solely on information provided by New Penn and/or Fortress in order to answer any questions or provide any assistance related to the loans.

**G. Fortress "Wins": 360 Mortgage's Business Was Destroyed.**

61.     GNMA's termination of 360 Mortgage's issuer status at the intentional and specific direction of Fortress decimated 360 Mortgage.

62.     First, as a direct result of GNMA's termination of 360 Mortgage's issuer status, the Doe Corporation terminated the transaction with 360 on October 11, 2018.  This was just two days after GNMA's termination of 360's issuer status and two days after 360 Mortgage notified them of GNMA's actions. Significantly, the Doe Corporation was aware of the three prior infractions alleged by GNMA as purported "violations", having conducted due diligence on 360 Mortgage during the negotiations related to the Doe LOI. Yet the Doe Corporation never raised any concern about such infractions or their potential impact on 360 Mortgage's issuer status. The Doe Corporation's termination of the agreement was in direct reply to 360 Mortgage's email notifying Doe Corporation of GNMA's unprecedented termination of 360 Mortgage's issuer status.

63.     Second, the immediate loss of the portfolio impacted 360's employees. 360 Mortgage had prided itself on hiring, mentoring, and training young talent to perform at levels well beyond their experience when compared to their peers. Due to Fortress's actions, 360 Mortgage had to lay off the vast majority of its staff in October 2018 and was forced to abandon its software and servicing platforms. Incredibly, some of these very capable people who helped build a company with impeccable audit performance and superior ratings will, for a period of at least three years, be unable to work in the mortgage industry for GNMA issuers—all as a result of GNMA's termination of 360.[14]

64.     Third, Fortress's wrongful conduct caused 360 Mortgage severe reputational damage in the mortgage bank industry because termination by GNMA is such an extreme action.

---

[14] *See* https://www.ginniemae.gov/issuers/program_guidelines/MBSGuideLib/Chapter_03.pdf, Part III.

For example, in response to GNMA's action, on October 12, 2018, the Federal National Mortgage Association ("FNMA" or "Fannie Mae") notified 360 Mortgage that it was suspending 360 Mortgage's "seller" approval, meaning that 360 was prohibited from selling loans to Fannie Mae. Fannie Mae confirmed to 360 Mortgage by phone that the only reason for its suspension was GNMA's revocation of 360 Mortgage's issuer status earlier that week. Fannie Mae expressed its assumption that 360 Mortgage was "hiding something" because "GNMA never terminates issuers in this manner." Similarly, the Federal Home Loan Mortgage Corporation ("Freddie Mac") also informed 360 Mortgage that "it had never heard of GNMA taking this kind of action" in response to immaterial and inaccurate notices like the three 360 had received and stated that they had "assumed that there was fraud involved." As a result of the termination, Freddie Mac also stripped away 360 Mortgage's ability to sell it Fannie Mae loans and imposed other restrictions.

65. 360 Mortgage was also **required** to notify all material counterparties with whom it did business of its loss of GNMA issuer status. GNMA's action has triggered and will continue to trigger significant reporting requirements for 360 Mortgage, which will result in additional consequences with other agencies and states. It also triggered various cross-default provisions in 360 Mortgage's lines of credit.[15]

66. To make matters worse, 360 Mortgage received a Consumer Financial Protection Bureau complaint as a result of the abrupt cessation of its servicing of the portfolio per GNMA's demand. 360 Mortgage lost its whole loan correspondent relationship with Wells Fargo, which terminated and rejected all of 360 Mortgage's loans. Further, 360 Mortgage's applications to sell

---

[15] In an incredible example of unbridled hubris, Fortress's Andrew Miller contacted 360 days after GNMA's termination. He claimed that he had just had a discussion with GNMA regarding 360 Mortgage's "troubles." Miller also demanded 360 Mortgage's financial information so that New Penn/Fortress could determine whether 360 Mortgage had breached any contractual terms due to the very termination that Fortress had conspired with Bright, Kasper and GNMA to bring about.

whole loans to Planet Home Lending and AmeriHome were rejected. 360 Mortgage also lost three of its five warehouse lenders and creditors. Business relationships with entities such as Daiwa, Fannie Mae, Customers Bank, Flagstar, and Comerica (to name a few) have also ceased in response to GNMA's action. All but one of 360 Mortgage's securities dealers terminated 360's right to commit to securities trades. Additionally, numerous customers have reached out to 360 Mortgage, reporting that they have been told to no longer sell 360 Mortgage loans because of the negative stigma created by GNMA's termination.

67.     Finally, 360 Mortgage had maintained a working relationship with Bank of Oklahoma, one of 360's securities dealers, for over eight years. However, Bank of Oklahoma abruptly terminated relations with 360 Mortgage after GNMA's termination of 360's issuer status was unofficially "announced" through a leak to the press.

68.     In the end, 360 Mortgage stood up to the billionaires behind Fortress and its attempt to extort an unjust re-write of the New Penn sale contract and an $11 million payment. But money is power, and Fortress used its influence with Bright, Kasper and GNMA to exact its revenge on and decimate 360 Mortgage and put nearly 150 hard-working people out of work.

## Causes of Action

### A.  Count 1: Tortious Interference with Existing Contract

69.     Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

70.     Beginning in or about July 2018, Fortress intentionally acted in such a manner so as to disrupt, destroy, and interfere with the then-existing, valid contractual relationship between 360 Mortgage and GNMA, which had existed since October 2011.

71.   Fortress was aware of the contract between 360 Mortgage and GNMA, as evidenced by Jonathan Grebinar and Michael Nierenberg's threats made to 360 Mortgage concerning 360 Mortgage's contract with GNMA.

72.   Fortress possesses great wealth and extreme influence in the mortgage industry and maintains a close relationship with GNMA. In July 2018, Fortress made clear statements to 360 Mortgage threatening to destroy its business and contractual relationship with GNMA. Including the statements previously discussed above and incorporated in this paragraph, Fortress's representatives made the following threatening statements:

- Andrew Miller's statement, on or about July 13, 2018, in a telephone call with 360 Mortgage's Chief Operating Officer, that the MSR industry is relatively small, and therefore it would not be worth 360 tarnishing its reputation over the contested money.

- Jonathan Grebinar's statement, on or about July 16, 2018 in a telephone call with 360 Mortgage's in-house counsel, that the owners of Fortress are "billionaires" and are not typically the type of people companies want to "piss off."

- Jonathan Grebinar's statement in that same phone call that individuals at Fortress intend to "put 360 Mortgage out of business" if 360 did not pay.

- Jonathan Grebinar's statement in that same call that, despite the confidentiality provision in the agreement between New Penn and 360 Mortgage, someone from Fortress would discuss the issue with GNMA the following morning to address New Penn's and Fortress's disappointment with 360 Mortgage's handling of the contract dispute. He stated that Fortress had a good relationship with GNMA and indicated that the intent was to communicate that 360 Mortgage has been uncooperative and unresponsive.

- Michael Nierenberg's statement, on or about July 17, 2018, in an email to 360 Mortgage's President, that Fortress would do whatever it needed to do to recover the disputed money.

- Michael Nierenberg's statement in that same email that "Fortress regularly reviews its counterparties and transactions with the various governing agencies [GNMA]." He then warned that "[i]t is a small world and not honoring your agreements is simply unacceptable."

73.   Endeavoring to carry out Fortress's threats, and for the sole purpose of inflicting harm on 360 Mortgage, Fortress intentionally procured GNMA's wrongful termination of its

contract with 360 Mortgage. While the precise details of what Fortress said to Bright, Kasper and GNMA must necessarily await discovery, there is sufficient circumstantial evidence from the Fortress statements recited above and from the GNMA statements detailed previously, to establish that Fortress employed wrongful means that were independently tortious or criminal, beyond normal self-interest or other economic considerations. The evidence shows that, at a minimum, Fortress informed Bright, Kasper and GNMA that 360 Mortgage had breached the New Penn sale contract (which was untrue), that 360 Mortgage was unethical and untrustworthy (which was maliciously untrue), that 360 Mortgage could not be trusted to honor its agreement with GNMA (which was demonstrably false), and that GNMA should act to put 360 Mortgage out of business (which GNMA did, in fact, do at Fortress's behest).

74.    Fortress's procurement of the wrongful termination of 360 Mortgage's GNMA issuer status was wholly without justification and in no way materially benefited Fortress (or New Penn) economically, as the destruction of 360 Mortgage's contractual relationship with GNMA terminated New Penn's ability to acquire future servicing rights and loan servicing assistance from 360 Mortgage on the recently consummated servicing sale. Further, there was no reasonableness or appropriateness to the pressure Fortress asserted as a means of accomplishing its objective—at the time, obtaining the money claimed it was owed under the New Penn contract. When GNMA acted on October 9, 2018, New Penn had already filed suit in New York state court to resolve the money dispute. Fortress's sole motivation behind its wrongful and malicious actions was to intentionally harm 360 Mortgage, and its actions exceeded a minimum level of ethical behavior in the marketplace.

75.    By maliciously exercising the personal and financial influence attendant to Fortress's wealth and position, Fortress intentionally procured GNMA's wrongful termination of

360 Mortgage's issuer status. GNMA had no valid basis to terminate 360 Mortgage's issuer status, and such termination was, at a minimum, an abuse of GNMA's discretion under both the Guide and the contract between GNMA and 360 Mortgage that established 360 Mortgage's GNMA issuer status.

76.    GNMA's action at the behest of Fortress had a material and complete detrimental impact on 360 Mortgage's business income and profits, as well as caused irreparable harm to 360 Mortgage's reputation.

77.    GNMA would not have wrongfully terminated its contractual relationship with 360 Mortgage but for Fortress's actions. Prior to Fortress's interference, GNMA issued three notices to 360 regarding "violations" that were immaterial, disputed, and immediately resolved. Yet GNMA did not declare an *immediate* Event of Default against 360 until Fortress intervened, nearly five months after the third notice was issued. Moreover, GNMA had previously only taken such extraordinary action in cases of issuer insolvency or fraud (neither of which GNMA has ever alleged against 360).

78.    Fortress's tortious interference proximately caused injury to 360, resulting in damages including actual damages, consequential damages, incidental damages, compensatory damages, out-of-pocket damages, benefit-of-the-bargain damages, lost profits, loss of sales, loss of credit and/or investment, loss of business reputation and goodwill, loss of business, mitigation expenses and/or increased business expenses, exemplary damages, costs of court, pre-judgment interest, and post-judgment interest.

79.    The wrongful acts and/or omissions of Fortress described herein were intentional, malicious, wanton and willful, and were conducted in conscious disregard of the well-established rights of 360 Mortgage. Fortress's egregious actions evinced a high degree of immorality and

caused significant harm to 360 Mortgage. Thus, Plaintiff is entitled to recover exemplary and/or punitive damages.

80.    Plaintiff also seeks exemplary and/or punitive damages from Fortress based on the fraudulent, malicious, and/or grossly negligent actions and omissions of their agents, employees, and/or vice-principals that were taken on behalf of Fortress, in the course and duty of their employment of Fortress, and/or were authorized, approved, and/or ratified by Fortress.

**B.  Count 2: Tortious Interference with Existing and Prospective Business Relations**

81.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

82.    Prior to the termination of 360's GNMA issuer status, Plaintiff had maintained a business relationship with GNMA since Plaintiff first obtained GNMA issuer status in October 2011.

83.    There was a reasonable probability that 360 Mortgage would have continued business relationships with GNMA if Fortress had not: (1) threatened and attempted to extort Plaintiff; and (2) used its connections to wrongfully and unlawfully induce or force GNMA to exercise "death-penalty" termination sanctions against 360, for the sole purpose of destroying 360 Mortgage.

84.    Fortress knew of and intentionally interfered with 360 Mortgage's then-existing and prospective business relationships with GNMA, as evidenced by Andrew Miller's warning that the MSR industry is relatively small, so it would not be worth 360 tarnishing its reputation over the contested money. In addition, Michael Nierenberg's threat to 360 Mortgage that "Fortress regularly reviews its counterparties and transactions with the various governing agencies" shows Fortress's knowledge of and intentional interference with 360 Mortgage's business relationships with various governing entities, including GNMA. Additionally, Fortress explicitly threatened

Plaintiff that it had a good relationship with GNMA and that it was meeting with GNMA specifically to discuss its disappointment with Plaintiff. During the same time period from July 16 to July 23, Fortress communicated repeatedly with GNMA about New Penn's dispute with Plaintiff, and sent GNMA a copy of the complaint in a lawsuit New Penn had filed against Plaintiff.

85.    Defendant's conduct in interfering with Plaintiff's business relationship with GNMA was malicious and undertaken for the sole purpose of inflicting intentional harm on Plaintiff, as evidenced by its threats to Plaintiff and by the fact that it lacked any economic interest in influencing GNMA. What is more, Plaintiff's loss of its GNMA issuer status would only impede Fortress's or New Penn's ability to obtain payment from Plaintiff. Defendant's malicious intentions are further demonstrated by the fact that, following GNMA's termination of Plaintiff's issuer status, Defendant's representatives internally joked of 360's misfortune and continued to harass 360 Mortgage's founders. Defendant's conduct was egregiously wrongful and malicious, and exceeded mere self-interest or other economic considerations, as set forth in the paragraphs above.

86.    Additionally, Defendant's conduct was independently tortious or unlawful in nature. As detailed below, the conduct of Fortress (acting through Miller, Grebinar, and Nierenberg, among possibly others) violated a number of criminal statutes. Fortress also unlawfully induced Bright, Kasper, and GNMA to undertake the punitive and pretextual audit of 360 Mortgage that allegedly resulted in the termination of 360 Mortgage's issuer status. Further, Fortress is a powerful force in the financial and mortgage industries and with GNMA, and it was willing to leverage its power and influential force with GNMA.

87.    But for Defendant's wrongful conduct, GNMA would not have terminated Plaintiff's issuer status, and Plaintiff's business relationship with GNMA would have continued.

Defendant's tortious interference proximately caused injury to 360, resulting in damages including actual damages, consequential damages, incidental damages, compensatory damages, out-of-pocket damages, benefit-of-the-bargain damages, lost profits, loss of sales, loss of credit and/or investment, loss of business reputation and goodwill, loss of business, mitigation expenses and/or increased business expenses, exemplary damages, costs of court, pre-judgment interest, and post-judgment interest.

88.    Fortress's extreme and unfair actions also destroyed business opportunities with potential counterparties that were made aware of GNMA's actions taken at the behest of Fortress, further injuring Plaintiff. For instance, Elliott Management Corporation terminated its pursuit of business relations with 360 Mortgage in direct response to 360 Mortgage's loss of GNMA issuer status. Critical business associates ceased to deal with 360 Mortgage, most notably Fannie Mae, Wells Fargo, Daiwa, Bank of Oklahoma, Planet Home, Amerihome, and Woodside Mortgage (due to suspension of 360 Mortgage by Simmons Bank). In addition, business relationships with Customers Bank, Flagstar, and Comerica ceased as a result of Fortress's actions.

89.    The wrongful acts and/or omissions of Fortress described herein were intentional, malicious, wanton and willful, and were conducted in conscious disregard of the well-established rights of 360 Mortgage. Fortress's egregious actions evinced a high degree of immorality and caused significant harm to 360 Mortgage. Thus, Plaintiff is entitled to recover exemplary and/or punitive damages.

90.    Plaintiff also seeks exemplary and/or punitive damages from Fortress based on the fraudulent, malicious, and/or grossly negligent actions and omissions of their agents, employees, and/or vice-principals that were taken on behalf of Fortress, in the course and duty of their employment of Fortress, and/or were authorized, approved, and ratified by Fortress.

## "Criminal/Corrupt Conduct Exception"

91.     Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

92.     Further, and to the extent necessary to do so, Plaintiff affirmatively pleads that the *Noerr-Pennington* and related doctrines are not applicable to bar Plaintiff's claims in this suit or afford Fortress a defense against Plaintiff's claims.

93.     As a preliminary matter, Fortress's approaching Bright, Kasper and GNMA at a breakfast meeting, or any other such meeting, conference call, business communication, contact, or other forum or form of communication to make false and disparaging statements about 360 Mortgage, with the goal and intent of conspiring with government agency officials to maliciously and unjustifiably audit, punish, and ultimate destroy 360 Mortgage, does not constitute "petitioning" the government for purposes of *Noerr-Pennington* immunity.

94.     Furthermore, the facts alleged above demonstrate that Fortress, acting through Miller, Grebinar, and Nierenberg, as well as possibly others to be determined through discovery, engaged in overtly corrupt conduct, including but not limited to attempted extortion, and stepped beyond the mere bounds of zealous advocacy.

95.     Fortress's conduct as alleged above was criminal, not merely deceptive or unethical. Specifically, the conduct of Fortress (acting through Miller, Grebinar, and Nierenberg, among possibly others) violated a number of criminal statutes, including but not limited to the following:

>    a.  N.Y. PENAL LAW § 135.60 (coercion in the third degree), by attempting to compel or induce 360 Mortgage to pay $11million it did not owe by means of instilling in 360 Mortgage a fear that, if it did not pay, Fortress would use its influence with GNMA to "destroy" 360 Mortgage, an act which would not in itself materially benefit Fortress but which was calculated to harm 360 Mortgage with respect to its business, financial condition, or reputation.

    b.  N.Y. PENAL LAW §§ 110.00 and 155.05 (larceny by extortion or attempted extortion), by attempting, with the intent to deprive 360 Mortgage of $11 million Fortress and New Penn were not entitled to, to wrongfully take or obtain that money by compelling or inducing 360 Mortgage to pay the $11 million to Fortress or New Penn by means of instilling in 360 Mortgage a fear that, if it did not pay the money, Fortress would use its influence with GNMA to "destroy" 360 Mortgage, an act which would not in itself materially benefit Fortress but which was calculated solely to harm 360 Mortgage with respect to its business, financial condition, or reputation.

    c.  18 U.S.C. § 1951 (the "Hobbs Act"), by attempting or conspiring to obstruct, delay, or affect commerce by extortion, specifically, by attempting to obtain $11 million from 360 Mortgage by the wrongful use of actual or threatened fear that, if 360 Mortgage did not pay the money, Fortress would use its influence with GNMA to "destroy" 360 Mortgage.

    d.  N.Y. PENAL LAW § 200.04 (bribery in the first degree), by offering a benefit or conferring some type of benefit valued in excess of one hundred thousand dollars to a public servant, namely, GNMA's Michael Bright, with the understanding or agreement that as a result of Fortress's offer or giving, such public servant's vote, opinion, judgment, action, decision, or exercise of discretion as a public servant would thereby be influenced.

    e.  18 U.S.C. § 201 (bribery of public officials), by directly or indirectly, corruptly giving, offering, or promising anything of value to a public official, namely, GNMA's Michael Bright, with the intent to influence any official act, influence any public official to commit or aid in committing or allowing fraud, or inducing a public official to do or omit any act in violation of their lawful duty.

96.    Fortress's (through Miller, Grebinar, and Nierenberg) extortion, attempted extortion, blackmail, and bribery are not protected speech and are not entitled to *Noerr-Pennington* immunity.

## Jury Demand

97.    Plaintiff demands trial by jury of all issues so triable.

## Prayer for Relief

For these reasons, Plaintiff asks that the Court issue citation for Fortress to appear and answer, and that Plaintiff be awarded a judgment against Fortress for the following:

a.    actual damages;

b.    nominal damages;

c.    exemplary damages;

d.    equitable relief, including but not limited to, fee forfeiture, disgorgement, and/or constructive trust;

e.    prejudgment and post-judgment interest;

f.    court costs; and

g.    any and all other relief, in law and in equity, both special and general, to which Plaintiff is entitled.

Respectfully submitted,

THE LANIER LAW FIRM, P.C.

*/s/ W. Mark Lanier*
W. Mark Lanier
Texas State Bar No.: 11934600
Mark.Lanier@LanierLawFirm.com
Skip McBride
Texas State Bar No.: 13332400
Skip.McBride@LanierLawFirm.com
Alex J. Brown
Texas State Bar No.: 24026964
Alex.Brown@LanierLawFirm.com
Jonathan P. Wilkerson
Texas State Bar No.: 24050162
Jonathan.Wilkerson@LanierLawFirm.com
10940 W. Sam Houston Parkway N., Suite 100
Houston, Texas 77064
Telephone: (713) 659-5200
Fax: (713) 659-2204

***Attorneys for Plaintiff 360 Mortgage Group, LLC***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this the 13th day of September, 2022, the foregoing was filed through the Court's CM/ECF System, which will send a notice of electronic filing to any listed counsel of record.

<i>/s/ W. Mark Lanier</i><br>W. Mark Lanier